F. JOHN FITZWILLIAM *et al.*, Plaintiffs-Appellants, v. 1220 IROQUOIS VENTURE, by and through Walter J. O'Brien II, Defendant-Appellee.

Second District   No. 2—91—1083

Opinion filed August 25, 1992.—Rehearing denied September 24, 1992.

Michael A. Cotteleer & Associates, of Wheaton (Michael A. Cotteleer, of counsel), for appellants.

Walter J. O'Brien II and Angela Imbierowicz, both of O'Brien & Associates, P.C., of Oak Brook Terrace (Molly B. Murphy, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiffs, F. John Fitzwilliam and Alice Fitzwilliam, brought an action for injunctive and declaratory relief in the circuit court of Du Page County against defendant, 1220 Iroquois Venture, a limited partnership, seeking compensatory damages for constructive eviction and the wrongful assessment and seizure of property tax prorations.

Defendant filed a counterclaim for attorney fees and costs incurred in the instant lawsuit. Both parties filed motions for summary judgment. The trial court determined that defendant was entitled to summary judgment as to each count in plaintiffs' complaint and as to defendant's counterclaim for attorney fees and costs.

On appeal plaintiffs contend: (1) that paragraph 9 of the lease agreement between the parties, allowing defendant access to the

leased premises to make repairs, decorations, and alterations, is ambiguous; (2) that defendant's entry onto the premises constituted a constructive eviction under the lease; (3) that the trial court erred in finding defendant was entitled to retain real estate tax prorations; and (4) that the trial court erred in awarding attorney fees to defendant.

Plaintiffs are engaged in the business of acquiring wholesale commercial office space under long-term leases. Plaintiffs then sublease the space to one of the corporations wholly owned by plaintiffs (in the instant case, Business Link, Inc.) which, in turn, subleases the space as executive office suites and provides related clerical and office services under what is known as the "shared office concept." Plaintiffs leased certain commercial property at 1220 Iroquois Drive, Naperville, pursuant to a lease with defendant dated March 22, 1985, until December 31, 1989. A rider to the lease provided the plaintiffs with the option of extending the term of the lease for four consecutive one-year terms and according to the terms and conditions of the original lease. Plaintiffs did not exercise the option but, instead, on or about May 26, 1988, sent a letter through their broker, the Palmer Group, to defendant's designated management agent, McWilliams & Associates, Inc. (McWilliams), requesting a renegotiation of their lease. That letter detailed plaintiffs' lease requirements, including that the lease be executed by Business Link Naperville, Inc., another Illinois corporation owned and operated by plaintiffs. In a letter dated June 7, 1988, McWilliams, on behalf of defendant, rejected the terms and conditions proposed by plaintiffs in renegotiating their lease.

On February 1, 1989, Business Link Naperville, Inc., entered into a lease with Upland Industries Corporation for new commercial space for the operation of its subleased office concept. Section 3.01 of that lease provided for payment to the future tenants of $35,700 "for Tenant's benefit to offset its rental obligations under the lease whereby Tenant currently occupies office space." The lease provided a November 1, 1989, occupancy date.

On March 27, 1989, Kay Porsche, defendant's property manager, wrote plaintiffs expressing her disappointment in learning via newspaper articles of plaintiffs' plans to move out of the premises in question at the termination of their lease rather than being personally informed of plaintiffs' decision. On July 12, 1989, Walter O'Brien, defendant's general partner, wrote plaintiffs requesting that, in view of their "well-publicized intention to vacate" the space presently leased by them, plaintiffs acknowledge their waiver of

their right to extend their lease beyond the termination date of December 31, 1989, so that defendant could then advertise the availability of the premises.

On October 9, 1989, plaintiffs' attorney wrote defendant advising defendant of plaintiffs' intention "to exercise their right to continued possession of the leased premises until their lease expires on December 31, 1989, and no sooner." Counsel also informed defendant:

"that failure to occupy the lease premises with persons and/ or office furniture prior to December 31, 1989 is under no circumstances to be construed as an abandonment or surrender of said premises nor is the cessation of tenants' conducting business at the lease premises to be construed in a similar manner."

On November 1, 1989, the sublessees of Business Link, Inc., then located at 1220 Iroquois Drive, Naperville, moved to the new premises obtained by Business Link Naperville, Inc. Plaintiff F. John Fitzwilliam, as president of Business Link, Inc., arranged for the moves. According to Fitzwilliam, Business Link, Inc., did not move out on November 1. Following the moves, a few pieces of furniture were left in the reception area of the premises. With the exception of one telephone, all telephone equipment and telephones were moved on October 31, 1989, to the new location. The post office was notified that Business Link, Inc.'s, new address was to go into effect November 1, 1989. From November 2 to November 20, the old premises were occupied by one of two young women who brought her baby to the premises and baby-sat the child there. According to Fitzwilliam, the women were to do nothing but answer the phone and direct people or deliveries to the new location.

According to the terms of plaintiffs' lease with defendant, plaintiffs were to pay the rent on or before the first day of each month. On November 4, 1989, defendant served plaintiffs with a 10-day notice for the payment of $17,695.84, rent due for the month of November. The requested rent was paid on November 10, 1989. No rent was paid for the month of December.

On November 17, 1989, workmen entered the premises in question for purposes of redecorating. Paragraph 9 of plaintiffs' lease with defendant provided in relevant part:

"The Tenant shall permit the Landlord to erect, use and maintain pipes, ducts, wiring and conduits in and through the demised premises. The Landlord or Landlord's agents shall have the right to enter upon the premises, to inspect the

same, to perform janitorial and cleaning services and to make such decorations, repairs, alterations, improvements or additions to the premises or the Building as the Landlord may deem necessary or desirable, and the Landlord shall be allowed to take all material into and upon said demised premises that may be required therefor without the same constituting an eviction of the Tenant in whole or in part and the rent reserved shall in no wise abate (except as provided in Section 10) while said decorations, repairs, alterations, improvements, or additions are being made, by reason of loss or interruption of business of the Tenant, or otherwise. If the Tenant shall not be personally present to open and permit an entry into said demised premises, at any time, when for any reason an entry therein shall be necessary or permissible, the Landlord or Landlord's agents may enter the same by a master key, or may forcibly enter the same, without rendering the Landlord or such agents liable therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property), and without in any manner affecting the obligations and covenants of this Lease."

Kay Porsche acknowledged at her deposition that she scheduled improvements to be made on the premises in question in November and December 1989. According to Porsche, she knew that plaintiffs' lease expired December 31, 1989, and that a new tenant, Iroquois Executive Suites, wanted to occupy the premises on January 1, 1990. Her goal was to have the refurbishments completed by that date.

On December 4, 1989, plaintiff F. John Fitzwilliam wrote to Walter O'Brien, general partner of defendant, advising him that plaintiffs considered the "unauthorized occupation" by defendant's workmen of the premises leased by plaintiffs to constitute a constructive eviction of the premises and that defendant's eviction forced plaintiffs' abandonment of the premises effective as of November 17. Fitzwilliam demanded a rebate of the November rent prorated from November 17, a confirmation that no liability existed for the December rent, and a release of the $35,000 security deposit letter of credit pledged to defendant in connection with plaintiffs' lease. Also, on December 4, plaintiffs filed their complaint for injunctive and declaratory relief, seeking among other claims, a temporary restraining order prohibiting defendant from drawing upon the letter of credit posted as security for plaintiffs' obligations pursuant to the lease.

On December 7, 1989, plaintiffs presented an emergency motion for a temporary restraining order to prevent defendant from making a draw on the letter of credit. Following a hearing, the court denied the motion. On December 15, 1989, plaintiffs presented a motion for rehearing on the motion for a temporary restraining order, which the trial court also denied. Plaintiffs then filed a notice of interlocutory appeal to this court on the denial of their motion for emergency injunctive relief. The appeal was dismissed on December 28, 1989.

On December 18, 1989, as permitted under the terms of the letter of credit, defendant made a draw against the letter of credit in the amount of $27,539.01. The amounts drawn on the letter of credit represented unpaid rent, interest on unpaid rent, and real estate tax prorations and interests.

On February 20, 1990, defendant filed its counterclaim against plaintiffs for attorney fees incurred in responding to the action instituted by plaintiffs. On March 21, 1990, plaintiffs filed their amended complaint. Plaintiffs also filed a motion to dismiss defendant's counterclaim for attorney fees, which was denied on May 23, 1990. The parties then filed cross-motions for summary judgment.

On July 2, 1991, the trial court entered an order granting defendant's motion for summary judgment on its claim for attorney fees and denying plaintiffs' motion for summary judgment on all counts. Defendant subsequently sought a modification of the court's order to increase the amount of attorney fees awarded. Plaintiffs moved for reconsideration of the July 2, 1991, order and also objected to defendant's petition for a modification of attorney fees. Plaintiffs' motion for reconsideration was denied on September 11, 1991, and defendant's request for an increase in attorney fees was granted.

Plaintiffs appeal from the trial court's order denying their motion for reconsideration; the order granting summary judgment in favor of defendant on plaintiffs' complaint and on defendant's claim for attorney fees; and the order denying plaintiffs' motion to dismiss defendant's counterclaim.

■ Plaintiffs first contend that paragraph 9 of the lease agreement between the parties, allowing defendant access to the leased premises to make repairs, decorations and alterations, is ambiguous. We are in agreement with defendant, however, that plaintiffs are attempting to create an ambiguity where none exists.

Paragraph 9 of the lease provides in pertinent part:

"The Tenant shall permit the Landlord to erect, use and maintain pipes, ducts, wiring and conduits in and through the demised premises. The Landlord or Landlord's agents shall have the right to *enter upon the premises*, to inspect the same, to perform janitorial and cleaning services and *to make such decorations, repairs, alterations, improvements or additions to the premises or the Building as the Landlord may deem necessary or desirable*, and the Landlord shall be allowed to take all material into and upon said demised premises that may be required therefor *without the same constituting an eviction of the Tenant in whole or in part* and the rent reserved shall in no wise abate (except as provided in Section 10) while said decorations, repairs, alterations, improvements, or additions are being made, by reason of loss or interruption of business of the Tenant, or otherwise. *If the Tenant shall not be personally present to open and permit an entry into said demised premises*, at any time, when for any reason an entry therein shall be necessary or permissible, *the Landlord or Landlord's agents may enter the same by a master key*, or may forcibly enter the same without rendering the Landlord or such agents liable therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property), and *without in any manner affecting the obligations and covenants of this Lease*." (Emphasis added.)

Pursuant to the terms of this provision, the defendant, as landlord, or defendant's agents were authorized to enter the premises occupied by plaintiffs at any time, without plaintiffs' consent, to make decorations, alterations, improvements, or additions to the premises. The type of work defendant's workmen did following their entry into the premises on November 17, 1989, *i.e.*, painting and replacing existing carpeting with new carpeting, fell within the type of activity authorized in paragraph 9.

■ Plaintiffs maintain that defendant was not entitled to both possession of the premises and rent. However, paragraph 9 specifically provides that the landlord may enter the premises for purposes of making decorations and improvements and that such entry does not affect the obligations and covenants of the lease. Additionally, plaintiffs' assertion that paragraph 9 should be read to incorporate a limitation on the purpose of such work or for whose benefit the work is made is without foundation. The lease contains no such limitation.

■ Nevertheless, plaintiffs maintain that not considering for whose benefit the decorations and improvements were done or requiring plaintiffs' consent to enter to perform these acts constituted a commercially unreasonable interpretation of paragraph 9. However, at the time plaintiffs agreed to this provision and the other provisions of the lease they were represented by an attorney. Moreover, plaintiff F. John Fitzwilliam testified at his deposition that before signing the lease he read it and understood it. Thus, he demonstrated that he agreed to the terms of the lease as written.

The trial court questioned, in its opinion letter, whether it was good business judgment for plaintiffs to accept the terms of paragraph 9, but the trial court held that this question was not a matter for the court's resolution absent any allegation of coercion, fraud, or disparity in the economic bargaining positions of the parties. Here, no evidence of any of these conditions existed. The trial court stated "the parties to this contract [the lease agreement] were both sophisticated business people." The fact that one of the parties later decided that the terms of the agreement were unfair or not to his liking did not automatically make the agreement unreasonable.

A contract is ambiguous if it is reasonably susceptible to more than one meaning, but an ambiguity is not created merely because the parties disagree as to the meaning of its terms. (*People ex rel. Burris v. Memorial Consultants, Inc.* (1992), 224 Ill. App. 3d 653, 656.) Whether an ambiguity exists in a contract is a question of law. (*Srivastava v. Russell's Barbecue, Inc.* (1988), 168 Ill. App. 3d 726, 732.) Where no ambiguity exists, the intent of the parties at the time the agreement was entered into must be determined from the language used in the agreement itself, not from the construction placed upon it by the parties. *People ex rel. Burris*, 224 Ill. App. 3d at 656-57.

Here, no ambiguity exists because the terms of paragraph 9 are susceptible to only one meaning, *i.e.*, that defendant, as landlord, had the right to enter plaintiffs' premises, without plaintiffs' consent, for purposes of redecorating and making improvements to the premises. Moreover, such entry did not constitute a constructive eviction or permit plaintiffs to terminate, or abate, the rental payments even if loss or interruption of plaintiffs' business occurred, which did not happen in the instant case. By November 1, plaintiffs had moved their entire operation as well as all their sublessees, leaving only one telephone behind and a woman, baby-sitting her child, to answer the phone or to direct people coming to the premises to plaintiffs' new location. Defendant's workmen did not enter

plaintiffs' premises until 17 days after plaintiffs' move. Not only was the entry permitted by the lease but also, given the state of affairs at the time of the entry, plaintiffs' right to quiet enjoyment of the premises was not destroyed.

■ In their second contention plaintiffs claim that defendant's entry onto plaintiffs' premises constituted a constructive eviction under the lease. However, as noted above, paragraph 9 specifically provided that the landlord's entry onto tenant's premises to make "decorations, repairs, alterations, improvements or additions to the premises" was allowed and did not constitute "an eviction of the Tenant in whole or in part." Moreover, the rent did not terminate by reason of the tenant's loss or interruption of business while the decorations, repairs, alterations, improvements, or additions were being made. As we have already determined that paragraph 9 of the agreement is not ambiguous, the agreement must be enforced according to its terms. (*Duncan v. Cannon* (1990), 204 Ill. App. 3d 160, 167.) The terms of paragraph 9 specifically allow the entry complained of here and state such entry does not constitute an eviction.

Even if, however, paragraph 9 of the lease did not govern plaintiffs' claim, plaintiffs could not prevail in their claim of constructive eviction. Whether a tenant has been constructively evicted is a question of fact. (*Dell'Armi Builders, Inc. v. Johnston* (1988), 172 Ill. App. 3d 144, 148.) Where premises leased are rendered useless to the tenant or the tenant is deprived, in whole or in part, of the possession and enjoyment thereof as a result of a landlord's wrongful act, there is a constructive eviction. (*Metropolitan Life Insurance Co. v. Nauss* (1992), 226 Ill. App. 3d 1014, 1019-20.) The facts presented to the court did not establish that the premises in question were rendered useless to plaintiff by an act of defendant.

As alleged in their complaint, plaintiffs were "engaged in the business of acquiring wholesale commercial space under long-term leases for re-lease as executive office suites to short-term lessees." Prior to November 1, plaintiffs' corporation, Business Link, Inc., and various sublessees of plaintiffs occupied the premises in question. Plaintiffs entered into a new lease for new premises, commencing on November 1, 1989. In an office memorandum plaintiffs apprised their subtenants that October 31 was "PACKING DAY," that November 1 was "MOVE DAY," and that on November 2 the subtenants should "ARRIVE AT NEW OFFICE. TURN IN OLD KEYS AND RECEIVE PASS CARDS AND KEYS TO NEW LOCATION." Plaintiff F. John Fitzwilliam testified at his deposition

that plaintiffs moved their business operations as well as all their subtenants out of the leased premises on November 1. Fitzwilliam acknowledged that all telephone equipment was removed on October 31 and that all other equipment and machines were removed on November 1. According to Fitzwilliam, the post office was given the date of November 1 as that on which plaintiffs' new address was to become effective. A letter dated November 6, 1989, from Fitzwilliam to a realty agency established that the move to the new premises had already occurred and that both plaintiffs and their tenants were pleased with the new facility. Consequently, plaintiffs could not show that the acts of defendant's workmen following their entry onto the premises were aimed at depriving plaintiffs of the enjoyment of the premises because at the time of the entry plaintiffs' activities authorized under the lease were no longer being conducted on the premises.

We conclude that the actions of defendant were specifically authorized pursuant to the terms of paragraph 9. But, even if this authority was absent, the evidence was insufficient to support plaintiffs' claim that defendant's actions constituted a constructive eviction.

Next, plaintiffs contend that the trial court erred in finding defendant was entitled to retain 1990 real estate tax prorations. The parties do not dispute that, pursuant to the terms of the lease, plaintiffs were liable for a *pro rata* portion of the real estate taxes owed by defendant. However, according to plaintiffs, they were liable only for the taxes *paid during* a lease term year and, therefore, could not be charged for prorations based on assessment figures for taxes payable in 1990, as defendant claims, since plaintiffs' lease terminated on December 31, 1989. From the record before us, we agree with plaintiffs.

■ Paragraph 2(b)(1) of the lease provided that the plaintiffs shall pay to defendant, as additional rental, a portion of the real estate taxes due on the building in which plaintiff leased premises. Paragraph 2(b)(1) provided in relevant part:

"The amount of Taxes, attributable to any year of the Lease Term, shall be the amount payable during any such year, even though the assessment for such Taxes may be for a different year. The aditional [sic] rental shall be paid monthly with Tenants [sic] Base Rent and for the first year of occupancy will be an estimate furnished by Landlord until the initial years [sic] taxes are ascertained."

Under the clear terms of this provision, the real estate taxes attributable to the lease term in question, 1989, would be those taxes payable in that year. As it is common knowledge that the real estate taxes due in a given year are those for the previous year, the taxes payable in 1989 would be those due for 1988 and would be based on the 1988 assessment figures. Kay Porsche, defendant's managing agent, acknowledged this fact at her deposition when, in explaining the payment of the tax prorations, she testified that "in 1989, *** they [all the tenants] were paying the real estate tax assessment based on the 1988 bill."

Despite this statement, Porsche went on to state that when the tax bill or assessment for a current leased year, 1989 in the instant case, arrives, she then charges a tenant the amount the tenant's proration is "short" based on the total amount due in that tax bill. No evidence of this procedure appears in the record except for the December 6, 1989, letter sent to plaintiffs by Porsche, after plaintiffs filed suit, seeking defendant's *pro rata* share of the 1989 real estate taxes on the premises in question. Also in the record, however, is plaintiff F. John Fitzwilliam's response to Porsche's letter objecting to any liability for 1989 taxes, pursuant to the terms of plaintiffs' lease agreement. According to Fitzwilliam's response, plaintiffs were liable in 1989 for taxes defendant paid in 1989 although based on the 1988 assessment of defendant's property and could not be held liable for 1989 taxes which were payable in 1990 after the termination of plaintiffs' lease.

Except for Porsche's December 6, 1989, letter, no other documentary evidence was submitted to the court to show that the procedure advocated by Porsche at her deposition, of charging a tenant an additional proration at the time the current leased year's taxes arrived, was that which defendant had always followed. When questioned about paragraph 2(b)(1) of the lease, Porsche admitted that such procedure was inconsistent with the terms of the lease. Porsche stated that under the lease a tenant's tax liability for 1989 would have been based on the 1988 tax bill. Porsche also admitted that the 1989 real estate taxes were payable in 1990, not in 1989. Furthermore, the 1989 assessment mailed to defendant by the tax assessor's office and submitted as part of plaintiffs' motion for summary judgment specifically set forth that payment was in 1990.

Plaintiff Fitzwilliam, at his deposition, testified that the prorations for real estate taxes were included in the monthly rental payments and that he made only one total payment each month. This testimony was supported by documents presented to the court, *i.e.*,

the 10-day landlord's notice sent to plaintiffs for the November 1989 rent, listing the rent due as $17,695.84; a copy of plaintiffs' check in that amount, dated November 8, 1989; and defendant's draw on the letter of credit issued by plaintiffs as security, designating the unpaid rent for December 1989 as $17,695. The lease specifically provided that the monthly rent in 1989 was to be $16,254.66. The difference, therefore, between the amount cited in the lease and the actual amount plaintiffs owed each month in 1989 reflects that the tax prorations were included as part of the monthly rental payments, as Fitzwilliam stated.

Additionally, Fitzwilliam related that each year he would be notified of the increase in the tax proration and of the resultant, new, monthly rental payment. Fitzwilliam testified that the tax prorations paid by plaintiffs in a particular year represented those taxes paid in that year. Thus, according to Fitzwilliam, the prorations included in plaintiffs' 1989 rental payments were for defendant's 1988 taxes which were payable in 1989.

A contract must be enforced according to its terms or not at all, and a court possesses no authority to compel a party to do something other than that which he has agreed to do in his contract. (*Village of Grandview v. City of Springfield* (1984), 122 Ill. App. 3d 794, 797.) The testimony and documents presented to the lower court as well as the plain language of the lease agreement demonstrate that plaintiffs were compelled to pay in 1989 only prorations based on taxes payable in that year, *i.e.*, defendant's 1988 real estate taxes. We conclude, therefore, that the trial court erred in ordering plaintiffs to pay the sum of $9,551.54 which was calculated on the basis of the 1989 real estate taxes for defendant's property. Accordingly, we reverse that portion of the court's order pertaining to tax prorations and remand for a determination of the tax monies repayable to plaintiffs.

Last, plaintiffs argue that the trial court erred in awarding attorney fees to defendant. In so awarding, the trial court relied on paragraph 18(h) of the lease agreement. Paragraph 18(h) provided:

> "The Tenant shall pay upon demand all the Landlord's costs, charges and expenses, including the fees of counsel, agents and others retained by the Landlord, incurred in enforcing the Tenant's obligations hereunder or incurred by the Landlord in any litigation, negotiation or transaction in which the Tenant causes the Landlord, without the Landlord's fault, to become involved or concerned."

Despite the clear language of this provision, plaintiffs, after a prolonged discussion of the interpretation of the word "fault," conclude that because they have made a good-faith and *bona fide* claim against defendant, defendant is not entitled to recover its fees under paragraph 18(h). Such a conclusion, as defendant points out, is inconsistent with the express language of paragraph 18(h).

■ Here, the fees and costs incurred by defendant directly resulted from proceedings instituted against defendant by plaintiffs. After reviewing all the materials submitted by the parties, the trial court denied plaintiffs' motion for summary judgment on the issue of defendant's liability under the allegation set forth in plaintiffs' complaint and, instead, granted summary judgment to defendant as to each count of plaintiffs' complaint. No fault was attributed to defendant. In defending the instant lawsuit initiated by plaintiffs, defendant incurred substantial attorney fees. Whereas, here, plaintiffs caused defendant to become involved in litigation and the result of that litigation was that defendant was not found to be at fault, defendant is entitled to attorney fees.

Although the terms of paragraph 18(h) appear difficult, plaintiffs, as sophisticated business people, agreed to the terms, and no showing was made that plaintiffs' agreement to the provision resulted from undue economic disparity, coercion, misrepresentation, or fraud. Accordingly, the trial court did not err in finding that, under paragraph 18(h), defendant was entitled to payment by plaintiffs of the attorney fees and costs defendant incurred in the instant litigation.

Plaintiffs also contend that the trial court erred in not conducting an evidentiary hearing on the amount of attorney fees to be awarded to defendant. Plaintiffs maintain that it was "fatal" to the award of attorney fees "that no expert testimony was offered as to the reasonableness of the charges." As defendant correctly points out, however, while expert testimony is proper on the issue of reasonableness of fees, such testimony is not required as a matter of law. *In re Marriage of Salata* (1991), 221 Ill. App. 3d 336, 339; *Johns v. Klecan* (1990), 198 Ill. App. 3d 1013, 1024.

The party seeking attorney fees, whether for himself or on behalf of a client, always bears the burden of presenting sufficient evidence from which the trial court can render a decision as to their reasonableness. (*Kaiser v. M E P C American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 983.) Time records, although important, are not conclusive in determining a fee award and should be scrutinized to determine whether they represent a reasonable ex-

penditure of time in the context of the work performed. (*McHugh v. Olsen* (1989), 189 Ill. App. 3d 508, 514.) A trial judge's experience and knowledge may be relied upon in determining what constitutes a proper expenditure of time. 189 Ill. App. 3d at 514.

■ Here, defendant's evidence consisted of detailed time records which defendant attached to its counterclaim for attorney fees, its motion for summary judgment, and its subsequent motion for *additur*. The records constituted more than just a mere compilation of hours multiplied by a fixed hourly rate. They also specified by detailed entries the particular services performed and by whom they were performed. It is apparent from the court's deduction of four items from defendant's claim for attorney fees that the court carefully scrutinized the time records and then relied on its own knowledge and experience in determining the value of defendant's legal services.

An award of attorney fees is left to the trial judge's sound discretion and will not be reversed absent an abuse of that discretion. (*In re Marriage of Angiuli* (1985), 134 Ill. App. 3d 417, 423.) As the judge here had been involved in the case since December 1989, we may assume that he was able to determine from the detailed time records submitted whether the fees were reasonable and necessarily incurred for the services rendered. Accordingly, where it is evident that the judge scrutinized the records and then reduced the defendant's claim for fees prior to making his award, we find no abuse of discretion.

■ Without citation to any authority, plaintiffs also assert that because Walter O'Brien, an attorney in the firm of O'Brien & Associates, attorneys for defendant, is also defendant's general partner, a distinction must be made between costs incurred by defendant and costs incurred by attorney O'Brien in defending his own conduct in the name of the partnership. According to plaintiffs, consideration of these separate rules was necessary in determining the reasonableness of defendant's fees. However, arguments that fail to cite authority in support thereof do not merit consideration on appeal. (*Dillard v. Kean* (1989), 183 Ill. App. 3d 28, 31.) Because plaintiffs have failed to cite authority to support this final argument, we deem the argument waived. We note specifically that the one case plaintiffs cite in their original brief is only an abstract of a decision and, therefore, unreliable as support for the singular point for which it is cited. See 134 Ill. 2d R. 23.

We conclude that the trial court did not err in awarding attorney fees to defendant.

The interpretation of a contract, where no factual dispute exists, is a question of law properly decided on a motion for summary judgment. (*Shorr Paper Products, Inc. v. Aurora Elevator, Inc.* (1990), 198 Ill. App. 3d 9, 12.) In reviewing the granting of summary judgment, our function is to determine whether the trial court correctly found that no genuine issue of material fact existed and whether judgment was correctly entered for the moving party as a matter of law. (*Zale Construction Co. v. Hoffman* (1986), 145 Ill. App. 3d 235, 241.) As a question of law, this court may interpret a contract independent of the trial court's judgment. *Shorr*, 198 Ill. App. 3d at 12-13.

■ Here, summary judgment was an appropriate means of disposing of the litigation. In reviewing the lease agreement and all the other materials presented to the trial court, we find that the court correctly entered summary judgment in defendant's favor except as to the issue of the interpretation of paragraph (2)(1) of the lease pertaining to tax prorations.

Accordingly, the judgment of the circuit court of Du Page County is affirmed in part and reversed in part, and the cause is remanded for further proceedings in accordance with the directions expressed herein.

Affirmed in part; reversed in part and remanded with directions.

McLAREN and DOYLE, JJ., concur.