John **SERPICO, et al., Plaintiffs–Appellants,**

v.

**LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, et al., Defendants–Appellees.**

Nos. 96–1937, 96–1939.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1996.

Decided Oct. 16, 1996.

Dan K. Webb, Howard M. Pearl, Matthias A. Lydon, Winston & Strawn, Chicago, IL, Sherman Carmell (argued), Carmell, Charone, Widmer, Mathews & Moss, Chicago, IL, for Plaintiff-Appellant in No. 96-1937.

Robert E. Shapiro, Gayle L. Yeatman, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, Robert D. Luskin (argued), Daniel A. Braun, Comey, Boyd & Luskin, Washington, DC, for Laborers' International Union of North America in No. 96-1937.

Robert E. Shapiro, Gayle L. Yeatman, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, Brendan R. Sullivan, Howard W. Gutman, Williams & Connolly, Washington, DC, for Arthur A. Coia in No. 96-1937.

Robert E. Shapiro, Gayle L. Yeatman, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, for Rollin P. Vinall, Mason M. Warren, Vere O. Haynes in No. 96-1937.

Sherman Carmell (argued), Suzanne M. Law, Carmell, Charone, Widmer, Mathews & Moss, Chicago, IL, for Plaintiffs-Appellants in No. 96-1939.

Robert E. Shapiro, Gayle L. Yeatman, Robert D. Luskin (argued), Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, Brendan R. Sullivan, Howard W. Gutman, Williams & Connolly, Washington, DC, for Defendants-Appellees in No. 96-1939.

Before CUMMINGS, EASTERBROOK and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Department of Justice believes that the Laborers' International Union of North America has been infiltrated by mobsters. In November 1994 the Organized Crime and Racketeering Section of the Department's Criminal Division sent the Union a proposed

complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). The Department threatened to file this complaint unless the Union swiftly made internal changes to curtail the influence of organized crime. After a flurry of negotiations, the Union's General Executive Board threw in the towel. In January 1995 it issued an Ethical Practices Code, backed up by an Ethics and Disciplinary Procedure with stiff penalties. To administer the Code and Procedure the Board created four new posts (General Executive Board Attorney, Inspector General, Independent Hearing Officer, and Appellate Officer), delegated enforcement powers to them, and appointed persons whose backgrounds suggested that they would be vigorous. John Serpico and Samuel Caivano, Vice Presidents of the Union and members of the Board who had been identified in the draft RICO complaint as tools of organized crime, were suspended from office. An administrative process was begun (before the Independent Hearing Officer) to decide whether to make the suspensions permanent. The Board also signed a contingent consent decree empowering the Department to take sterner measures—but the Department promised not to file this decree in court unless it deemed the Board's other actions unsuccessful. So far, the Department appears to be satisfied: it has not sought to implement the consent decree.

Serpico and Caivano believe that they have been thrown to the wolves, and that Arthur A. Coia, the Union's president (who remains in office), is the chief racketeer. They filed separate suits contending that the Disciplinary Procedure violates Title I of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. §§ 411–15, because it was established without a vote of the membership. Caivano later resigned his offices and dismissed his complaint. Serpico lost because the district judge concluded that the Board has power to alter the Union's governance structure in an emergency, which the Board reasonably judged the threat of RICO litigation to be. 151 L.R.R.M. 2460, 1996 WL 41674 (N.D.Ill.1996). Serpico's case is moot, for he has resigned from the Union and lacks any interest in the outcome of these proceedings. But the litigation lives on; five of the Union's locals filed an identical suit of their own, and the adverse judgment has been appealed to us.

Article VIII § 2(b) of the Union's constitution authorizes the Board to

exercise legislative power when, in its opinion, it deems it necessary to conform to or comply with the law; or when, in its judgment, the exercise of such power is deemed necessary, proper and appropriate in an emergency. It may exercise this power for the purpose of new legislation or to amend the Constitution of the International Union or the Uniform Constitutions of affiliated Local Unions and District Councils. In the exercise of legislative authority other than above specified, the General Executive Board may submit any legislative proposal to the membership, by referendum.

■ The Board invoked this authority to establish the Code, Procedure, and new offices. Discretion belongs to the Board—which may act "when, in its opinion, it deems it necessary" or "when, in its judgment, the exercise of such power is deemed necessary, proper and appropriate"—not to individual locals, and certainly not to a federal court. Establishment of the constitution is an exercise in union democracy; and departing from the constitution by shrinking the Board's discretion defeats the members' choices. If the language of the Union's constitution is conclusive, then the district court's conclusion is compelled: the Board was entitled to deem the steps "necessary" both to comply with RICO and to avoid a lawsuit that might have landed the Union in federal receivership, where the members would enjoy no say at all. The word "necessary" in a constitution does not mean "essential"; it means expedient to the task at hand—for as the holder of legislative power defines what tasks to pursue, it also may decide how strong the support for the new rules needs to be. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413–14, 4 L.Ed. 579 (1819). Although the Board might have proposed steps to the membership and held a referendum, that could have looked to the Department like foot-dragging and impelled it to file suit all the quicker; assessing the risks of such

eventualities, and deciding how to respond, is what a legislative body such as the Board is for.

■ Although plaintiffs invoke Title I of the LMRDA, they are vague about which provision of that statute the Board's actions violate. The only arguably relevant portion is § 101(a)(1) of the Act, 29 U.S.C. § 411(a)(1):

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitutions and bylaws.

The Board did not hold a vote of the members. But then § 101 does not require any particular subject to be put to a referendum; it says only that when voting occurs every union member has equal rights to take part. Neither § 101 nor the LMRDA as a whole chooses between direct and representative democracy. The Union chose to have a little of each: most legislative decisions are to be made by the members, but the members also elect representatives (the Board) who may legislate in defined circumstances. If in the Board's judgment those circumstances come to pass, then the Board may act. Members retain their right to overrule the Board by referendum, or to throw the rascals out. At the Union's most recent General Convention, on September 26, 1996, the membership defeated proposals to junk the Ethical Practices Code, Disciplinary Procedure, and new offices, and voted instead to augment the Board's legislative powers. See *Providence Journal–Bulletin* § 1 p. 9A (Sept. 27, 1996). We do not think that this moots the case; the existence of the Code, Procedure, and offices may have influenced the outcome (the power to control the agenda, which the Board used, can be potent). But it does show that the members have not been deprived of the right to vote. All that happened is that their elected representatives used powers bestowed on them by the members' own votes. An ability to make choices

through representatives is important to effective democracy. Decisions may be complex, and persons in a large group who perceive that their votes are unlikely to alter the outcome are unlikely to devote the time and energy necessary to vote intelligently. It may then be best to entrust decisions to a smaller body of representatives, who have more time and better incentives to gather and act on information. This the Union has done, and we are neither authorized nor inclined to defeat that choice.

■ Plaintiffs emphasize the word "emergency" and insist that we should require the Board to prove its existence to the court's satisfaction. The basis of this argument is not § 101 but § 302, 29 U.S.C. § 462, a provision in Title III of the LMRDA dealing with the imposition of trusteeships on local unions. See *Maher v. Int'l Brotherhood of Electrical Workers,* 15 F.3d 711 (7th Cir. 1994). A trustee displaces the existing governance structure, a step that requires greater justification than implementing terms of an existing structure; moreover, § 302 limits the purposes for which trusteeships may be established, which invites inquiry into the reasons the international union acted. Plaintiffs say that the district judge did not allow them adequate discovery into the Board's purposes and motives. Because the plaintiffs did not file an affidavit under Fed.R.Civ.P. 56(f), this contention has not been preserved for appellate review. More: § 101(a)(4) does not limit the purposes for which elected officials may act if a union chooses representative democracy.

The most one can say is that a union's top officials can defeat the members' votes by ignoring them—that is to say, by exceeding their powers—as well as by miscounting them, or by disfranchising some members. So there is a judicial role in ensuring that a union's executive board does not take an implausible view of its authority, see *Air Wisconsin Pilots Protection Committee v. Sanderson,* 909 F.2d 213, 218 (7th Cir.1990), an inquiry similar to the one used in review of arbitral decisions: a silly "interpretation" may show that the document wasn't being interpreted, but was being ignored. See also *Local 48 v. United Brotherhood of Carpen-*

*ters,* 920 F.2d 1047, 1054 (1st Cir.1990); *Newell v. Int'l Brotherhood of Electrical Workers,* 789 F.2d 1186, 1189 (5th Cir.1986). The district court looked at the Board's decision from this perspective and concluded that it represented a genuine interpretation of the Union's constitution. We, too, think that reasonable and honest interpreters could have concluded that the steps the Board took were necessary to avoid a RICO complaint, which given the dire consequences of a receivership could have been deemed an emergency. Plaintiffs' argument that the Board violated "fiduciary duties" to the members, see 29 U.S.C. § 501, is just another invitation to bypass the representative institutions established in the Union's constitution; it falls with the argument under § 101(a)(1). Any more intensive review would substitute an unelected judge for the elected Board as the members' governing body.

AFFIRMED.