MITCHELL DIAMOND *et al.*, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs-Appellants and Cross-Appellees, v. UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 881, Defendant-Appellee and Cross-Appellant.

Second District No. 2—01—0151

Opinion filed May 3, 2002.

Lawrence A. Rosen, John S. Monical, and Paul M. Weltlich, all of Lawrence, Kamin, Saunders & Uhlenhop, of Chicago, for appellants.

Jonathan D. Karmel and Mindy Kallus, both of Karmel & Gilden, of Chicago, for appellee.

JUSTICE GROMETER delivered the opinion of the court:

Plaintiffs, Mitchell Diamond and Amy M. Weltlich, represent a class of plaintiffs who are or were members of defendant, United Food and Commercial Workers Union Local 881 (the local). In the present action, plaintiffs allege that defendant imposed a temporary special dues assessment on its members in a manner that contravened defendant's bylaws. Following a bench trial in the circuit court of Du Page County, judgment was entered in defendant's favor. Plaintiffs now appeal.

In the action below, defendant asserted a number of affirmative defenses and filed a counterclaim seeking a declaratory judgment and attorney fees. The trial court found that none of the defenses applied and also denied defendant's counterclaim. Defendant has filed a conditional cross-appeal, asking that we review these rulings in the event that we reverse the decision of the trial court based on plaintiffs' appeal. Because we affirm, we will not address defendant's cross-appeal.

## BACKGROUND

Defendant is a labor union that represents employees, primarily in

the retail food industry, throughout Illinois and northwest Indiana. Defendant is chartered by the United Food and Commercial Workers International Union (the international). At the time of the events that form the basis of this case, defendant had approximately 35,000 members.

In the fall of 1991, defendant embarked on a program, dubbed the LEAD campaign, to picket nonunion grocery stores. Defendant sought to encourage its members to picket these stores by paying them $8.50 per hour for doing so. In order to finance this campaign, defendant needed to raise money. Accordingly, defendant sought to impose a special assessment of $8.66 per month on its members. The assessment was to be imposed for an 18-month period. This was, apparently, the only occasion that defendant had sought to impose such an assessment. Defendant's executive board approved the program, and the matter was submitted to defendant's members for a vote.

A notice was sent out to the local's members advising them of the upcoming vote. The LEAD campaign was also featured in an edition of defendant's newsletter. Actual voting occurred at 21 meetings, which were held between October 8, 1991, and October 30, 1991. One meeting was held in Chicago, and a number were held in the suburbs surrounding the city. Additional meetings were held throughout the local's geographic area. Of the approximately 35,000 members, only 2,035 attended these meetings. The special assessment was approved, with 1,169 members voting to approve it and 818 members voting against it. Forty-eight ballots were void or otherwise not counted. During the 18 months the assessment was imposed, 49,000 of the local's members were ultimately affected, and the local raised over $5 million.

The special assessment was enacted pursuant to article XI, section A, of the local's bylaws. This section provides:

> "Except as otherwise provided in the International Constitution, reasonable dues, initiation and reinstatement fees, and general or special assessments shall be established, increased or levied by the Local Union by a majority vote by secret ballot of the members."

Article VI, section G, contains the following general provision directing how votes are to be conducted:

> "Except as otherwise provided in these bylaws, all matters calling for a vote shall be determined by a majority of the active members present and voting on the question."

Article VI, section H, states that, except as otherwise specified, proceedings "shall be conducted in accordance with common parliamentary procedure designed for the conduct of orderly and democratic meetings."

Additionally, the bylaws vest authority in the local's president to

"interpret the bylaws and rules of the Local Union." At trial, the local's president, Ronald E. Powell, testified that he interpreted article XI, section A, of the local's constitution to mean that approval of a special assessment required a majority vote of those present at a particular meeting. Powell acknowledged that, at the time of the vote, he was never called upon to formally interpret the provision. In support of his interpretation, Powell stated that the local relies on Robert's Rules of Order. Further, he stated his interpretation was consistent with that of the international and that the local's bylaws cannot conflict with the international's constitution.

Jonathan S. Jay, special counsel to the international's president, also testified. He stated that the international's constitution is the supreme law of the organization and that a local's bylaws cannot conflict with it. The local's bylaws are based on model bylaws promulgated by the international. He added that article XI, section A, of the local's constitution is a nearly verbatim restatement of article 38, section A, of the international's constitution. According to Jay, the international interpreted this section in the same manner that Powell interpreted the dues provision in the local bylaws. Jay explained that article 38, section A, tracked federal law governing dues increases for labor organizations. See 29 U.S.C.A. § 411(a)(3)(A) (West 1998) (allowing dues increases after a "majority vote by secret ballot of the members in good standing voting at a general or special membership meeting"). Jay also testified that both the international's constitution and the local's bylaws incorporate "common parliamentary procedure," and the international, like the local, relies on Robert's Rules of Order. Jay also noted that the international interpreted article XI, section A, consistently with the general voting provisions contained in article VI, section G, which state that votes are determined by a majority of those present and voting. Finally, Jay testified that he was unaware of any other local that required a vote by a majority of the entire membership to approve a dues increase and that the international would not approve such a provision, since it would conflict with the international's constitution.

The trial court found the local's interpretation of the dues provision reasonable. Accordingly, the trial court entered judgment against plaintiffs. This appeal ensued.

## ANALYSIS

Plaintiffs argue that the trial court's interpretation of the local's bylaws was erroneous. Essentially, they contend that the plain language of article XI, section A, requires a majority vote of the entire membership of the local to approve a dues increase. Specifically, they

rely on the portion of the section that states dues increases must be approved by "a majority vote by secret ballot of the members." They argue that this language is clear and unambiguous and that the trial court erred by departing from the four corners of the bylaws in reaching its decision. Thus, according to plaintiffs, the special assessment was invalid because only 1,169 of the local's approximately 35,000 members voted to approve it.

■ Before addressing plaintiffs' argument, we must first determine the applicable standard of review. The constitution and bylaws of a labor organization constitute a contract between the organization and its members. *Illinois Education Ass'n v. Illinois Federation of Teachers*, 107 Ill. App. 3d 686, 689 (1982). The interpretation of a contract presents a question of law. *Fitzwilliam v. 1220 Iroquois Venture*, 233 Ill. App. 3d 221, 237 (1992). We conduct *de novo* review of a trial court's decision in such circumstances. *In re Shaffer*, 319 Ill. App. 3d 1048, 1051 (2001). Thus, we owe no deference to the trial court's decision.

■ However, there is another level of review in this case where both the reviewing court and the trial court owe deference to an interpretation of the contract. Although the constitution and bylaws of a union or other unincorporated association are a contract, they are a special type of contract that historically has been regarded as unique. *Local 165 v. Bradley*, 149 Ill. App. 3d 193, 202 (1986). Any individual who becomes a member of such an organization, " 'either by express stipulation or by implication, agrees to abide by all rules and regulations adopted by the organization.' " *Blackshire v. National Ass'n for the Advancement of Colored People (NAACP), Inc.*, 285 Ill. App. 3d 561, 564 (1996), quoting *Engel v. Walsh*, 258 Ill. 98, 103 (1913). The constitution or bylaws of a union may, and often do, contain provisions for the resolution of disputes that occur within the organization. See, *e.g., Local 165*, 149 Ill. App. 3d at 202-03; *Kendler v. Rutledge*, 78 Ill. App. 3d 312, 312-13 (1979). Similarly, they may explicitly vest authority with some officer or body of the organization to interpret the constitution or bylaws (see, *e.g., Maher v. International Brotherhood of Electrical Workers*, 15 F.3d 711, 714 (7th Cir. 1994)) or even allow the exercise of legislative authority in certain circumstances (see, *e.g., Serpico v. Laborers' International Union of North America*, 97 F.3d 995, 997 (7th Cir. 1996)). In the present case, the local's bylaws vest authority in the local's president to "interpret the bylaws and rules of the Local Union." Hence, as the bylaws constitute a contract between the members and the union, the members have agreed that the president has the power to interpret the bylaws, and they may be bound by such an interpretation. Accordingly, we and the trial court owe some deference to the president's interpretation of the bylaws. ·

This is not to say, however, that there is no place for judicial intervention in a dispute between a union and its members. As bylaws are a contract, they are capable of being breached. We do not believe that the provision vesting interpretive power in the president can be read to allow the local to do whatever it pleases under the guise of interpretation. The question with which we are confronted is, how much deference do we owe to the president's interpretation of the bylaws? Fortunately, we find considerable guidance to aid us in both Illinois and federal law.

■ Illinois has long recognized the principle that courts should be reluctant to intervene in the internal affairs of an unincorporated association. In 1913, our supreme court articulated this principle as follows: "Courts will not interfere to control the enforcement of by-laws of such associations, but they will be left free to enforce their own rules and regulations by such means and with such penalties as they may see proper to adopt for their government." *Engel*, 258 Ill. at 103. This principle continues to retain its vitality. See, *e.g.*, *Finn v. Beverly Country Club*, 289 Ill. App. 3d 565, 568 (1997); *Blackshire*, 285 Ill. App. 3d at 564-65.

Accordingly, courts will interfere in the internal affairs of an unincorporated association only in narrow circumstances. Judicial review is limited to whether an exercise of power by the association conformed with its own internal rules or whether an association violated a member's fundamental right to a fair hearing. *Lee v. Snyder*, 285 Ill. App. 3d 555, 559 (1996). In the present case, plaintiffs are not contending they did not receive an adequate hearing; rather, their challenge to the special assessment raises a question as to whether the local exercised power in conformity with its bylaws. The bylaws, however, vest authority in the president to interpret the constitution. Hence, this exception to the noninterference principle cannot be read as allowing *de novo* review of the activities of the local whenever a member bases a cause of action upon an alleged breach of the bylaws. Instead, judicial intervention is appropriate only in instances of fraud, mistake, collusion, or arbitrariness. *Finn*, 289 Ill. App. 3d at 568. Plaintiffs do not allege fraud, mistake, or collusion, so arbitrariness appears to be the relevant category here.

■ Federal law recognizes a similar principle. There is "a general national policy against judicial interference in the internal affairs of unions." *Rota v. Brotherhood of Ry., Airline & Steamship Clerks*, 489 F.2d 998, 1003 (7th Cir. 1973). The federal courts articulate a noninterference principle similar to that used in Illinois; however, they frame it in terms of reasonableness rather than arbitrariness. See, *e.g.*, *Millwright Local No. 1079 v. United Brotherhood of*

*Carpenters & Joiners of America,* 878 F.2d 960, 962 (6th Cir. 1989); *Loretangeli v. Critelli,* 853 F.2d 186, 192 (3rd Cir. 1988); *Local Union No. 657 v. Sidell,* 552 F.2d 1250, 1257 (7th Cir. 1977). In *Air Wisconsin Pilots Protection Committee v. Sanderson,* 909 F.2d 213, 218 (7th Cir. 1990), the Seventh Circuit stated that "a union's interpretation of its own constitution, bylaws, and other promulgations is entitled to judicial deference; we must be able to call the interpretation unreasonable, perhaps even 'patently unreasonable,' before we can set it aside." This principle holds true even where there is enough ambiguity in the bylaws to create a triable issue. *Air Wisconsin Pilots Protection Committee,* 909 F.2d at 218.

■ Thus, a federal court will defer to a union's interpretation of its bylaws unless it is unreasonable, and an Illinois court will defer unless the interpretation is arbitrary. "Arbitrary" and "unreasonable" are similar standards and, in fact, are often used in conjunction in making certain evaluations. For example, a court abuses its discretion where its decision is "arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." See, *e.g., People v. Robertson,* 312 Ill. App. 3d 467, 469 (2000). Similarly, a regulation promulgated by an administrative agency may be overturned if it is arbitrary or unreasonable. *Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board,* 274 Ill. App. 3d 145, 148 (1995). In sum, there is little difference between Illinois law and federal law regarding the deference to which an unincorporated association like a union is entitled when it interprets its own constitution or bylaws.

While the federal court's reluctance to interfere in internal union affairs is a matter of "general national policy" (*Rota,* 489 F.2d at 1003), ordinary principles of contract law also lead to the conclusion that this court may reject Powell's interpretation of the dues provision only if it is unreasonable. As noted above, bylaws constitute a contract that binds a union and its members. See *Local 165,* 149 Ill. App. 3d at 202. Since the bylaws vest interpretative authority in the president, the members have agreed to be bound by these interpretations. However, to be valid, contracts must bind both parties. *Board of Education, Arbor Park School District No. 145 v. Ballweber,* 105 Ill. App. 3d 412, 415 (1982). Thus, like the members, the local is also bound by the bylaws.

■ Implicit in every contract in this state is a duty of good faith and fair dealing. *Northern Trust Co. v. VIII South Michigan Associates,* 276 Ill. App. 3d 355, 367 (1995). This obligation "requires the party vested with contractual discretion to exercise it reasonably, and he may not do so arbitrarily, capriciously, or in a manner inconsistent

with the reasonable expectation of the parties." *Bank One, Springfield v. Roscetti*, 309 Ill. App. 3d 1048, 1059-60 (1999). By giving the president the power to interpret them, the bylaws grant him great discretion. Thus, while the members have agreed to be bound by the president's interpretations, if his interpretations are unreasonable, they violate the duty of good faith implicit in the bylaws as a contract. So long as the president interprets the bylaws in a reasonable manner, the contract has not been breached. Conversely, an arbitrary or unreasonable interpretation results in a breach of contract.

■ Thus, considering Illinois law pertaining to unincorporated associations, federal labor policy, and ordinary principles of contract law, it is clear that we owe considerable deference to Powell's interpretation of the dues provision. These three sources all indicate that we must defer to his interpretation unless it is arbitrary or unreasonable. Hence, while we conduct *de novo* review of the decision of the trial court, we will substitute our judgment for that of Powell only if his interpretation is arbitrary or unreasonable. With these standards in mind, we will now address plaintiffs' contention that the manner in which the local imposed the special assessment violated its bylaws.

■ After reviewing the record and the bases for the president's interpretation, it is apparent that his interpretation was not unreasonable. First, we note that, despite plaintiffs' protestations to the contrary, the provision in question is potentially ambiguous. The relevant portion of article XI, section A, provides that "a majority vote by secret ballot of the members" is necessary to approve a dues increase. Plaintiffs' argument focuses on the terms "majority" and "of the members." However plaintiffs do not account for the inclusion of the term "vote." Arguably, the term "vote" limits the class from which a majority is determined to those actually voting. Plaintiffs' position would be somewhat more persuasive if the bylaws merely stated "a majority of the membership." They cite an unpublished decision from the appellate court of Tennessee that found such language unambiguously meant a majority of all members. However, in the present case, the inclusion of the term "vote" creates a possible ambiguity.

Moreover, assuming the provision is unambiguous, we are not convinced that a member of a union or unincorporated association vested with the authority to interpret bylaws or constitutions is necessarily bound by the same rules of contractual construction that bind a court. Plaintiffs ask us to apply the four-corners rule and the parol evidence rule in interpreting the contract. Why the local's president should be bound by such rules is unclear. The touchstone of our review of the president's actions is reasonableness. Thus, so long as the president's method of interpretation is neither arbitrary nor unrea-

sonable, there is no basis for judicial intervention. Picking two interpretations and flipping a coin would be arbitrary; relying on relevant parol evidence or departing from the four corners of a document is not.

Several factors demonstrate that the president's interpretation of the dues provision was reasonable. First, as Powell testified, his interpretation was consistent with that of the international's constitution, and the local's bylaws could not conflict with the international's constitution. Jay confirmed these statements and added that he was unaware of any local that conducted votes on dues provisions in the manner advocated by plaintiffs.

Second, Jay testified that the local's bylaws are based on model bylaws promulgated by the international and that the dues provision in the local's bylaws track a provision in the international's constitution. The international's constitution, in turn, tracks federal law, which allows dues increases to be implemented by a "majority vote by secret ballot of the members in good standing voting at a general or special membership meeting" (29 U.S.C.A. § 411(a)(3)(A) (West 1998)). Powell's interpretation was thus consistent with federal labor law.

Third, the general provision on voting, contained in article VI, section G, provides that "all matters calling for a vote shall be determined by a majority of the active members present and voting on the question." Thus, Powell's interpretation is consistent with the general manner in which votes are taken. Plaintiffs point to the prefatory language to the section that states that it applies only where a voting procedure is not otherwise delineated. However, given the potential ambiguity in the dues provision, we cannot say that it was unreasonable to look to this provision for guidance.

Fourth, as the local points out, plaintiffs' interpretation would preclude the local from implementing a dues increase unless it actually persuaded a majority of its members to show up at a meeting and vote for it. Alternatively, the local could conduct a vote by mail, but this would still require a majority to actually return ballots. Moreover, as Powell stated, voting by mail is typically used only for simple issues where there is no need to provide an extensive presentation to the members regarding the subject on which they are voting. Powell's interpretation is thus reasonable in that it allows the local to implement dues increases following a vote in a meeting by an informed electorate despite the fact that a majority of the members do not attend.

Finally, we find both sides' reliance on Robert's Rules of Order (Robert's Rules) unpersuasive. Robert's Rules provides that "when the term majority vote is used without qualification *** it means more than half of the votes cast by persons legally entitled to vote *** at a

regular or properly called meeting." Robert's Rules of Order § 43, at 3955 (9th ed. 1990). Thus, interpreting "majority vote" as applying to those present and voting is consistent with Robert's Rules. Plaintiffs contend that this passage actually supports their position, pointing out that it states that the term must be used without qualification and that "of the members" qualifies "majority vote." Thus, plaintiffs argue that Robert's Rules recognizes that "majority vote" may be qualified. While plaintiffs appear to have the better of this argument, it must be remembered that the local's president is vested with the authority to interpret the bylaws and that the bylaws can reasonably be read as incorporating Robert's Rules. Consequently, it does not appear unreasonable for Powell to have looked to a portion of Robert's Rules to define a particular term in the bylaws. In any event, we find that both sides' arguments on this point warrant little weight.

In short, we are unable to conclude that Powell's interpretation of the dues provision is unreasonable. Accordingly, we must defer to it. Before concluding, we will address plaintiffs' argument that the subject of dues increases raises the specter of union overreaching and that we thus should not apply a deferential standard in assessing a union's actions in this limited sphere.

In arguing that dues increases raise special policy concerns, plaintiffs rely on the following passage:

"There is, of course, a general national policy against judicial interference in the internal affairs of unions. [Citations.] But that general policy is subject to important exception in specific areas in which Congress has found that the interests of individual members need special protection against the danger of overreaching by entrenched union leadership. [Citations.] The subject of dues increases is such an area." *Rota*, 489 F.2d at 1003.

In this passage, the *Rota* court refers to a congressional finding that members of labor unions require special protection in the area of dues increases. The finding the court is referring to is Congress's enactment of special provisions governing voting procedures a union may employ in seeking a dues increase (see 29 U.S.C.A. § 411(a)(3)(A) (West 1998)). *Rota*, 489 F.2d at 1003. The *Rota* court noted that, regarding dues increases, Congress has mandated a majority vote by secret ballot held at a general or special meeting (see 29 U.S.C.A. § 411(a)(3)(A) (West 1998)). *Rota*, 489 F.2d at 1003-04. Thus, Congress has set forth a specific procedure to address the policy concerns raised when a union seeks a dues increase. In the present case, plaintiffs do not allege that the local violated the standard set by Congress, and, after our review of the record, it does not appear to us that such a violation occurred. It is difficult to see how the local could have transgressed against the

policy concerns recognized by Congress when it acted in conformity with the minimum procedures established by Congress to vindicate those concerns. We thus find plaintiffs' reliance on this national policy unpersuasive.

Moreover, we are unconvinced that dues increases represent some special area where we should abandon our traditional reluctance to interfere in internal union affairs. As noted previously, an individual who becomes a member of an unincorporated association " 'agrees to abide by all rules and regulations adopted by the organization.' " *Blackshire*, 285 Ill. App. 3d at 564, quoting *Engel*, 258 Ill. at 103. By joining the union, members, of their own free will, agree to be bound by the union's rules, including those concerning dues. None of the members of the local were compelled to join; rather, they did so as a condition of employment. The LEAD campaign was launched in response to nonunion grocers operating in the local's territory. If the local's members did not want to be bound by the union's rules, they could have sought employment in these stores. Quite simply, having accepted the benefits of union membership, the local's members were subject to the burdens as well.

## CONCLUSION

In light of the foregoing, the judgment of the circuit court of Du Page County is affirmed. Given our resolution of plaintiffs' appeal, we need not address defendant's conditional cross-appeal.

Affirmed.

BOWMAN and KAPALA, JJ., concur.