[No. B168662. Second Dist., Div. One. Dec. 16, 2003.]

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JERRY HILL et al., Real Parties in Interest.

436

COUNSEL

Heller Ehrman White & McAuliffe, Paul Alexander, Pamela Davis, Robin Schaefers; Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy, Sheila L. Birnbaum, Douglas W. Dunham and Ellen P. Quackenbos for Petitioner.

LeBoeuf, Lamb, Greene & MacRae, Dean Hansell and Sharon C. Corda for National Conference of Insurance Legislators as Amicus Curiae on behalf of Petitioner.

Robert E. Wagner for Illinois Department of Insurance as Amicus Curiae on behalf of Petitioner.

Sonnenschein Nath & Rosenthal, Paul E. B. Glad and Sonia Martin for National Association of Mutual Insurance Companies as Amicus Curiae on behalf of Petitioner.

Alschuler Grossman Stein & Kahan, Barry Leigh Weissman and Daniel A. Fiore for National Association of Insurance Commissioners as Amicus Curiae on behalf of Petitioner.

Livingston & Mattesich, Gene Livingston, John McCarron and Stacy E. Gillespie for Citizens for a Sound Economy Foundation as Amicus Curiae on behalf of Petitioner.

Sedgwick, Detert, Moran & Arnold and Christina J. Imre for National Association of Independent Insurers, Alliance of American Insurers and American Insurance Association as Amici Curiae on behalf of Petitioner.

Horvitz & Levy, Barry R. Levy and Jeremy B. Rosen for Personal Insurance Federation of California and Association of California Insurance Companies as Amici Curiae on behalf of Petitioner.

Victoria E. Fimea; Mayer, Brown, Rowe & Maw and Donald M. Falk for American Council of Life Insurers as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Hennigan, Bennett & Dorman, J. Michael Hennigan, Jeanne E. Irving, Mark Anchor Albert; Gianelli & Morris, Timothy J. Morris; Law Offices of Robert S. Gerstein and Robert S. Gerstein for Real Parties in Interest.

## OPINION

**MALLANO, J.**—This is an action against a mutual automobile insurance company incorporated and headquartered in Illinois, where the board of

directors holds its meetings. A group of policyholders contends that the insurance company's board of directors did not pay the dividends it promised. The trial court certified the case as a nationwide class action and ruled that California law, not Illinois law, governs the policyholders' causes of action.

The insurance company has filed a petition for a writ of mandate, challenging the trial court's ruling that California law applies. We conclude that, because the declaration of dividends concerns the internal affairs of the insurance company, Illinois law applies in this case. We therefore grant the petition.

I

## BACKGROUND

Defendant State Farm Mutual Automobile Insurance Company (State Farm) was created in 1922 under the laws of the State of Illinois. It is incorporated there and is headquartered in Bloomington, Illinois. The board of directors meets in Bloomington when making decisions about whether to declare dividends. State Farm's primary financial records are maintained there.

During the early to mid-1980's, State Farm automobile insurance policies provided that "the first insured named in the declarations is entitled . . . to share in the earnings and savings of the company in accordance with the dividends declared by the Board of Directors on this and like policies." At some point in the late 1980's, the policy language was changed to read: "[T]he first insured named in the declarations is entitled . . . to receive dividends the Board of Directors in its discretion may declare in accordance with reasonable classifications and groupings of policyholders established by such Board."

In a newsletter sent to California policyholders in 1998, State Farm described dividends as "a return of part of your premium because claim costs were less than anticipated." The newsletter also stated that "[o]ur goal as a mutual company is to put your interests first . . . ."

The bylaws of State Farm provide: "Subject to the provisions of law regarding return of excess premiums, the Board of Directors may authorize from time to time such refunds or credits to policyholders from the savings and gains of the Corporation and upon such terms and conditions and in such amounts or percentage as may, in their judgment, be proper, just and equitable."

On June 17, 1998, State Farm policyholders filed this action, alleging causes of action for breach of contract and breach of the covenant of good faith and fair dealing, among others. In general, the complaint alleges that the policyholders were entitled to dividends under their State Farm policies and that State Farm improperly withheld dividends in order to increase its surplus. The nationwide class certified by the trial court consists of 50 million former and current State Farm automobile insurance policyholders, 5 million of whom live in California.

The policyholders allege in the complaint that "State Farm breached its duty [to them] by amassing surpluses far in excess of what State Farm reasonably needed to meet its present and future insurance obligations," thereby reducing dividends. According to the policyholders, State Farm's board of directors improperly withheld dividends by (1) overstating underwriting losses, (2) understating investment income, (3) excluding from operating return the investment income derived from its surplus, and (4) falsely claiming that State Farm's surplus had to cover the obligations of its affiliated insurance companies.[1]

After the pleading stage, State Farm filed a motion to determine the substantive law applicable to the policyholders' causes of action and to dismiss the case. State Farm argued that, under the "internal affairs" doctrine, Illinois law applied and required that the case be dismissed in favor of an Illinois forum. The policyholders filed opposition papers, claiming that California law governed. In a statement of decision filed on May 21, 2003, the trial court denied the motion to dismiss and ruled that California law controlled.

State Farm filed a petition for a writ of mandate with this court, challenging the trial court's decision. We issued an order to show cause why the trial court's decision should not be vacated. We also established a briefing schedule and calendared the matter for oral argument. Having considered the parties' written and oral presentations, as well as the amici curiae briefs, we now consider the merits of the petition.

## II

## DISCUSSION

Because this appeal involves the application of legal principles to undisputed facts, we review the trial court's decision de novo. (See *In re Marriage*

---

[1] This case is before us for the second time. In prior proceedings, the trial court dismissed the case after sustaining State Farm's demurrer. This division, with one justice dissenting, reversed in a nonpublished opinion, *State Farm Mutual Automobile Ins. Co. v. Superior Court* (Jan. 30, 2001, B133262).

*of Armato* (2001) 88 Cal.App.4th 1030, 1034 [106 Cal.Rptr.2d 395]; *State Farm Mut. Auto. Ins. Co. v. Department of Motor Vehicles* (1997) 53 Cal.App.4th 1076, 1081 [62 Cal.Rptr.2d 178].)

We first discuss how surplus funds are used by an insurance company. We then address the conflict of laws issue, namely, whether California or Illinois law applies to the policyholders' causes of action. Finally, we discern the pertinent legal principles from the applicable substantive law.[2]

### A. *The Importance of Surplus*

State Farm is a mutual insurance corporation. As such, it "issues no capital stock and is cooperatively owned by its policyholders, who are both the insurers and the insureds . . . ." (1A Fletcher, Cyclopedia of the Law of Private Corporations (2002 rev.) § 75, p. 40.) Mutual insurers issue about one-third of property and liability insurance in the United States. (See 1 Ainslie et al., Business Insurance Law and Practice Guide (2003) § 1.01[3], p. 1-5.)

"Mutual insurance companies are organized, maintained, and operated solely for the benefit of their policyholders . . . . Such companies do not generate traditional entrepreneurial profits, but rather seek to meet their obligations at the lowest possible cost to the policyholders who, by paying premiums, provide the companies' exclusive source of capital." (Allegaert, *Derivative Actions by Policyholders on Behalf of Mutual Insurance Companies* (1996) 63 U. Chi. L. Rev. 1063, 1067.)

"Policyholders in mutual companies are denominated 'members' of the company; their ownership rights in the company are their 'membership interests.' Members of mutual insurance companies have many of the same rights as stockholders in corporations, including the right to vote and the right to residual surplus upon liquidation." (*UNUM Corp. v. U.S.* (1st Cir. 1997) 130 F.3d 501, 503, fn. 1.)

State Farm does not offer insurance policies as investment opportunities but instead provides policyholders with protection against loss. In contrast, a stock insurance company seeks to earn a profit for the benefit of its stockholders, who may or may not be policyholders. (See 1A Fletcher, Cyclopedia of the Law of Private Corporations, *supra*, § 75, p. 40; 3 Couch on Insurance (3d ed. 1997) § 39:3, p. 39-7; *id.*, § 39:15, pp. 39-18 to 39-19.)

"[M]utual insurers have greater difficulty [than stock insurers] in raising capital to fund growth, and hence, must rely to greater extent on accumulated

---

[2] The propriety of the trial court's ruling on the class certification motion is not before us.

surplus and income from new members to support growth. . . . [M]anagers of mutual insurers tend to exercise more discretion which tends to favor long-term stability over greater risk." (Klein, A Regulator's Introduction to the Insurance Industry (Nat. Assn. of Ins. Comrs. 1999) p. 5-4.)

As a practical matter, a mutual insurance corporation operates much like a stock insurance corporation. (See 1 Ainslie et al., Business Insurance Law and Practice Guide, *supra*, § 1.01[3], pp. 1-5 to 1-6; 5 Couch on Insurance, *supra*, § 80:53, p. 80-48.) Given that similarity, we rely on case law concerning stock companies where appropriate.

■ An insurer's "surplus" is the excess of assets over liabilities. (*UNUM Corp. v. U.S., supra*, 130 F.3d at p. 503, fn. 1; see *id.* at p. 505, fn. 4; accord, *Lubin v. Equitable Life Assur. Soc.* (1945) 326 Ill.App. 358, 361–362 [61 N.E.2d 753, 754–755].) "[S]urplus provides a safety cushion to absorb adverse results and protects the policyholder and the company by helping maintain the company's solvency during periods of unfavorable operating results." (Troxel et al., Property-Liability Insurance Accounting and Finance (4th ed. 1995) p. 129.) As the amount of surplus increases, the risk of insolvency decreases. (See U. S. Cong., Congressional Budget Off., The Economic Impact of a Solvency Crisis in the Insurance Industry (Apr. 1994) pp. 44–45.) The payment of dividends reduces the surplus. (See Breslin & Troxel, Property-Liability Insurance Accounting and Finance (1st 3d. 1978) pp. 19–25.)

State Farm invests its surplus, and the return on that investment is an essential part of the company's overall financial position. An insurer must have an adequate surplus at all times, especially in light of potential catastrophes that may result in substantial damage to numerous policyholders. (See U. S. Cong., Congressional Budget Off., The Economic Impact of a Solvency Crisis in the Insurance Industry, *supra*, at pp. 13–15.) State Farm refers to its surplus as "policyholder protection funds."

The financial soundness of an insurance company "depends on numerous factors that are difficult to quantify, and the insurance market is characterized by substantial diversity across insurers in types of business written, characteristics of customers, and methods of operation. It is impossible to specify the 'right' amount of [surplus] for most insurers through a formula." (Cummins et al., *An Economic Overview of Risk-Based Capital Requirements for the Property-Liability Insurance Industry* (1993) 11 J. Ins. Reg. 427, 435.) Each insurance company has its own method for determining the amount of surplus it considers to be adequate.

## B. *Conflict of Laws*

■ In this case, the policyholders contend that California substantive law governs the outcome of the litigation. State Farm contends that Illinois law applies. We conclude that Illinois law applies because the parties' dispute involves the internal affairs of the company.

" 'A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. . . .' . . .

". . . Every State in this country has enacted laws regulating corporate governance. By prohibiting certain transactions, and regulating others, such laws necessarily affect certain aspects of interstate commerce. . . . The markets that facilitate . . . national and international participation in ownership of corporations are essential for providing capital not only for new enterprises but also for established companies that need to expand their businesses. This beneficial free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation." (*CTS Corp. v. Dynamics Corp. of America* (1987) 481 U.S. 69, 89–90 [95 L.Ed.2d 67, 107 S.Ct. 1637].)

"The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." (*Edgar v. MITE Corp.* (1982) 457 U.S. 624, 645 [73 L.Ed.2d 269, 102 S.Ct. 2629], quoted with approval in *Havlicek v. Coast-to-Coast Analytical Services, Inc.* (1995) 39 Cal.App.4th 1844, 1854 [46 Cal.Rptr.2d 696].) "States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care." (*Atherton v. FDIC* (1997) 519 U.S. 213, 224 [136 L.Ed.2d 656, 117 S.Ct. 666].)

"Internal affairs" include " 'steps taken in the course of the original incorporation, . . . the adoption of by-laws, the issuance of corporate shares, the holding of directors' and shareholders' meetings, . . . *the declaration and payment of dividends* and other distributions, charter amendments, mergers, consolidations, and reorganizations, the reclassification of shares and the purchase and redemption by the corporation of outstanding shares of its own stock.' " (*In re Harnischfeger Industries, Inc.* (Bankr. D.Del. 2003) 293 B.R. 650, 662, italics added; accord, *In re Sagent Technology, Inc., Derivative Lit.* (N.D.Cal. 2003) 278 F.Supp.2d 1079, 1090–1091.)

As stated in the Restatement Second of Conflict of Laws: "It would be impractical to have matters . . . which involve a corporation's organic structure or internal administration[] governed by different laws. It would be impractical, for example, if . . . an issuance of shares, *a payment of dividends*, a charter amendment, or a consolidation or reorganization were to be held valid in one state and invalid in another. . . . In the absence of an explicitly applicable local statute to the contrary, . . . the local law of the state of incorporation has been applied to determine issues involving corporate acts of the sort [mentioned]." (Rest.2d Conf. of Laws, § 302, com. e, p. 310, italics added; accord, *Maher v. Zapata Corp.* (5th Cir. 1983) 714 F.2d 436, 464.)

With exceptions not pertinent in the present case, " '[t]he local law of the state of incorporation will be applied to determine the right of a shareholder to. participate in the administration of the affairs of the corporation [and] in the division of profits . . . .' " (*In re Revco D.S., Inc.* (Bankr. N.D. Ohio 1990) 118 B.R. 468, 504, fn. 12.) "[U]niform treatment of the shareholders of a corporation is an important objective which can only be attained by having their rights and liabilities with respect to the corporation governed by a single law. . . . [P]ractical necessity dictates that a single law should be applied to determine many of the issues dealt with here. Examples of such issues are what classes of shareholders may vote . . . ; *the validity . . . of a dividend* . . . ; the rights of a shareholder upon the issuance of new shares and his rights in the distribution of assets upon dissolution. It would be impractical to have issues such as these governed by the conflicting local law rules of two or more states." (Rest.2d Conf. of Laws, § 304, com. c, p. 322, italics added.)

The internal affairs doctrine was best explained by the Delaware Supreme Court in *McDermott, Inc. v. Lewis* (Del. 1987) 531 A.2d 206 (*McDermott*): "The traditional conflicts rule developed by courts has been that internal corporate relationships are governed by the laws of the [state] of incorporation. . . . [¶] . . . [¶] . . . 'The umbilical tie of the foreign corporation to the state of its charter is usually still religiously regarded as conclusive in determining the law to be applied in intracorporate disputes . . . .' " (*McDermott, supra*, 531 A.2d at pp. 215–216, italics added.)

The court in *McDermott* continued: "The policy underlying the internal affairs doctrine is an important one . . . : 'Under the prevailing conflicts practice, neither courts nor legislatures have maximized the imposition of local corporate policy on foreign corporations but have consistently applied the law of the state of incorporation to the entire gamut of internal corporate affairs. In many cases, this is a wise, practical, and equitable choice. It serves the vital need for a single, constant and equal law to avoid the fragmentation of continuing, interdependent internal relationships. . . . It facilitates planning and enhances predictability. . . . [A]pplying local internal affairs law to a

foreign corporation just because it is amenable to process in the forum or because it has some local shareholders or some other local contact is apt to produce inequalities, intolerable confusion, and uncertainty, and intrude into the domain of other states that have a superior claim to regulate the same subject matter. . : .'

"[T]he law of one state governs the relationships of a corporation to its stockholders, directors and officers in matters of internal corporate governance. The alternatives present almost intolerable consequences to the corporate enterprise and its managers. With the existence of multistate and multinational organizations, directors and officers have a significant right . . . to know what law will be applied to their actions. Stockholders also have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs." (*McDermott, supra,* 531 A.2d at pp. 216–217; accord, *Newell Co. v. Petersen* (2001) 325 Ill.App.3d 661, 687–688 [758 N.E.2d 903, 923, 259 Ill.Dec. 495], app. dism. (2002) 199 Ill.2d 558 [775 N.E.2d 3, 266 Ill.Dec. 441].)

In *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 471 [11 Cal.Rptr.2d 330, 834 P.2d 1148] (*Nedlloyd*), our Supreme Court cited *McDermott* with approval. There, several corporations and individuals located in various parts of the world, including California, entered into a contract to purchase stock in a company incorporated in Hong Kong. The contract contained a choice-of-law provision stating that the agreement would be governed and construed in accordance with Hong Kong law. A dispute arose under the contract, and the Hong Kong corporation filed suit in California. The parties disagreed as to the applicable law. The trial court and the Court of Appeal concluded that California law governed. The Supreme Court, relying on the Restatement Second of Conflict of Laws, held that the choice-of-law provision was valid, and Hong Kong law applied.

In reaching that conclusion, the high court stated: "[The plaintiff] identifies no fundamental public policy of this state that would be offended by application of Hong Kong law to a claim by a Hong Kong corporation against its allegedly controlling shareholder. We are directed to no California statute or constitutional provision designed to preclude freedom of contract in this context. Indeed, even in the absence of a choice-of-law clause, Hong Kong's overriding interest in the *internal affairs of corporations domiciled there* would in most cases require application of its law. (See Rest.[2d Conf. of Laws], § 306 [obligations owed by majority shareholder to corporation determined by the law of the state of incorporation except in unusual circumstances not present here]; *McDermott Inc. v. Lewis* (Del.Super.Ct. 1987) 531 A.2d 206, 214–216 [corporate voting rights dispute governed by law of state of incorporation]; *Matter of Reading Co.* (3d Cir. 1983) 711 F.2d

509, 517 [minority shareholder fiduciary duty claim governed by law of state of incorporation].)" (*Nedlloyd, supra*, 3 Cal.4th at p. 471, italics added.)

As noted, in *Nedlloyd, supra*, 3 Cal.4th 459, 471, the high court also cited *Matter of Reading Co., supra*, 711 F.2d 509, with approval. In that case, a minority shareholder filed suit against a corporation, seeking to compel the declaration of a dividend. The corporation had always used its earnings to support continued operation and growth. It did not attempt to maximize profits or accumulate a surplus but instead tried to minimize the price charged to customers (who were also shareholders). The corporation had never paid a dividend. In rejecting the plaintiff's demand for dividends, the Third Circuit, citing the Restatement Second Conflict of Laws, stated:

"[The minority shareholder's] claim must be judged under the law of Delaware, where [the corporation] is incorporated. . . . Under Delaware law, corporate directors stand in a fiduciary relationship to their corporation and its stockholders. . . . Similarly, a majority shareholder, or a group of shareholders who combine to form a majority, has a fiduciary duty to the corporation and to its minority shareholders if the majority shareholder dominates the board of directors and controls the corporation . . . . The scope and extent of the fiduciary duty depend upon the circumstances of the challenged action or inaction . . . . The Delaware courts will ordinarily apply the 'business judgment' rule, under which a court will not disturb the judgments of a board of directors 'if they can be attributed to any rational business purpose.' . . . [¶] . . . [¶]

"We must now apply the business judgment rule to [the corporation's] refusal to pay dividends[] and its continued reinvestment of earnings in new equipment. Each of the challenged policies can be attributed to a rational business purpose. . . . [The corporation], by setting the lowest possible . . . rates, presumably keeps demand for [its services] high. The refusal to pay dividends could help achieve that goal by eliminating the need to raise rates to earn a surplus. The reinvestment of earnings in new equipment assumedly helps [the corporation] meet the . . . needs of its customers. . . . [U]nder the challenged policies [the corporation] has undergone remarkable growth. . . . We conclude, therefore, that neither the directors nor the majority shareholders of [the corporation] have breached their fiduciary duty to [the minority shareholder]." (*Matter of Reading Co., supra*, 711 F.2d at pp. 517–520, citations omitted.)

"The corporate internal affairs rule is deeply ingrained in the choice-of-law culture. It has survived the conflicts revolution largely unscathed. In all but a handful of cases, the law of the state of incorporation is applied to disputes involving internal corporate affairs in spite of the various choice-of-law

theories adopted from year-to-year by the individual courts." (Johnson, *Risky Business: Choice-of-Law and the Unincorporated Entity* (1997) 1 J. Small & Emerging Bus. L. 249, 269–270, fns. omitted.)

In the present case, State Farm policyholders challenge the board of directors' decision whether to declare dividends. The policyholders rely on the language in their policies, a newsletter, and the bylaws, contending they have a contractual right to dividends that must be honored in accordance with their reasonable expectations. The policies state that policyholders are entitled to dividends as declared by the board of directors. A newsletter in 1998 referred to dividends as a return of part of the policyholders' premiums. The bylaws provide that the board of directors may authorize dividends from time to time.

According to the policyholders, their right to dividends should be adjudicated under contract law, the business judgment rule notwithstanding. And the trial court commented, "[State Farm is] not going to be able to use the corporation law as a trump over that contractual obligation." But the business judgment rule, which accords deference to the decisions of the board of directors, is reflected in the language of State Farm's policies, newsletter, and bylaws. The rule is, in essence, written into the contract.

■  Simply put, the policyholders challenge a decision of the board of directors that falls within State Farm's internal affairs. The causes of action in the complaint, though labeled in common terms—breach of contract and breach of the covenant of good faith and fair dealing—involve "matters *peculiar* to the relationships among or between the corporation and its current officers, directors, and shareholders . . . ." (*Edgar v. MITE Corp., supra*, 457 U.S. at p. 645, italics added.) As to those matters, the law of State Farm's place of incorporation, Illinois, applies (see *Atherton v. FDIC, supra*, 519 U.S. at pp. 223–224), not California's law on contracts (see, e.g., Civ. Code, § 1646).

In other words, "[t]he law applicable to a contract dispute . . . does not control claims relating to the internal affairs of the corporation." (*LaSalle Nat. Bank v. Perelman* (D.Del. 2000) 82 F.Supp.2d 279, 289; accord, *Relief Assn. of U. Wks., etc. v. Equitable L. Assur. Soc.* (1942) 140 OhioSt. 68, 70, 72–73 [42 N.E.2d 653, 654, 656] [internal affairs doctrine applies to action alleging that insurer's method of calculating dividends breached insurance policy]; *Ellis v. Mutual Life Ins. Co. of New York* (1939) 237 Ala. 492 [187 So. 434, 436, 449–450] [action alleging that insurer breached policy by reducing dividends on disability policies is governed by internal affairs doctrine].) In short, "[t]he plaintiff's contention that this suit[,] being one on a contract [to

recover surplus,] does not involve the internal affairs of a foreign corporation is without merit." (*Kelley v. American Sugar Refining Co.* (1st Cir. 1943) 139 F.2d 76, 79.)

█ This is not to say that, in determining the liability of a foreign corporation, courts must always apply the law of the state of incorporation. "In fields like torts, where the typical dispute involves two persons and a single or simple one-shot issue and where the common substantive policy is to spread the loss through compensation and insurance, the preference for forum law and the emphasis on the state interest in forum residents . . . [presents an acceptable application of forum law]." (*McDermott, supra,* 531 A.2d at p. 216.) "[I]n the management and method of its business affairs in California with the citizens and residents thereof, in the sale or disposition or transfer of the shares of stock, [a foreign corporation] must conform to the [securities regulations] of California . . . ." (*Western Air Lines, Inc. v. Sobieski* (1961) 191 Cal.App.2d 399, 409 [12 Cal.Rptr. 719], italics omitted.)[3]

" 'Corporations and individuals alike enter into contracts, commit torts, and deal in personal and real property. Choice of law decisions relating to such corporate activities are usually determined after consideration of the facts of each transaction. In such cases, the choice of law determination often turns on whether the corporation had sufficient contacts with the forum state, in relation to the act or transaction in question, to satisfy the constitutional requirements of due process. The internal affairs doctrine has no applicability in these situations. Rather, this doctrine governs the choice of law determinations involving . . . the relationships [among] the corporation, its directors, officers and shareholders.' " (*Draper v. Gardner Defined Plan Trust* (Del. 1993) 625 A.2d 859, 865; accord, *Western Air Lines, Inc. v. Sobieski, supra,* 191 Cal.App.2d at pp. 409–410; Rest.2d Conf. of Laws, § 301, coms. a–b, pp. 300–301; *id.,* § 302, com. e, p. 309.)

Similarly, " '[t]he *validity* of a contract of fire, surety or casualty insurance and the *rights* created thereby are determined by the local law of the state which the parties understood was to be the principal location of the *insured risk* during the term of the policy . . . .' " (*Weitz Co., LLC. v. Travelers Cas. &*

---

[3] In *Wilson v. Louisiana-Pacific Resources, Inc.* (1982) 138 Cal.App.3d 216 [187 Cal.Rptr. 852], the court addressed "whether the State of California may constitutionally impose its law requiring cumulative voting by shareholders upon a corporation which is domiciled elsewhere, but whose contacts with California, as measured by various criteria, are greater than those with any other jurisdiction." (*Id.* at p. 219.) In upholding the law, the court, in a single sentence of dictum, criticized the internal affairs doctrine. (*Id.* at p. 224.) But, in the 20 years since *Wilson* was decided, the internal affairs doctrine has received broad acceptance by the courts (see, e.g., *CTS Corp. v. Dynamics Corp. of America, supra,* 481 U.S. at pp. 89–90; *Atherton v. FDIC, supra,* 519 U.S. at pp. 223–224; *McDermott, supra,* 531 A.2d at pp. 215–217) and state legislatures (see fn. 4, *post*).

*Sur. Co.* (S.D. Iowa 2003) 266 F.Supp.2d 984, 993, italics added; accord, *Westchester Fire v. G. Heileman Brewing* (2001) 321 Ill.App.3d 622, 630 [747 N.E.2d 955, 962–963, 254 Ill.Dec. 543].)

"An *insured risk* is 'the object or activity which is the subject matter of the insurance,' and 'has its principal location . . . in the state where it will be during at least the major portion of the insurance period.' " (*Gates Formed Fibre Products v. Plasti-Vac, Inc.* (D.Me. 1988) 687 F.Supp. 688, 690, italics added.) "In the case of an automobile liability policy, this is where the vehicle will be garaged during most of the insurance period." (*Egnatic v. Nguyen* (Mo.Ct.App. 2003) 113 S.W.3d 659, 666; accord, *Colonial Ins. Co. of Cal. v. Spirco Environmental* (8th Cir. 1998) 137 F.3d 560, 561–562.) The law of that state will determine such issues as the risks covered by the policy, whether the insured has complied with policy provisions, and whether, in a third party action, the insured is entitled to the cost of a defense. (Rest.2d Conf. of Laws, § 193, com. a, p. 610.)

Further, a California court can apply local law to a foreign corporation that has sufficient contacts with the state, such as conducting business or having an office here. (See, e.g., *Valtz v. Penta Investment Corp.* (1983) 139 Cal.App.3d 803 [188 Cal.Rptr. 922] [Delaware corporation doing business in California with sole executive office in California must comply with California law allowing shareholders to inspect shareholder list]; *Western Air Lines, Inc. v. Sobieski, supra,* 191 Cal.App.2d 399 [Delaware corporation with principal place of business in California must comply with California law requiring cumulative voting for directors].)

And, as codified in the Corporations Code, California law governs certain internal affairs of a foreign corporation if more than half of the corporation's voting stock is held by California residents, and the corporation conducts a majority of its business in the state (as measured by assets, payroll, and sales). (See Corp. Code, § 2115, subds. (a), (b).) In those circumstances, California law even regulates the dividends of a foreign corporation to some extent. (See, e.g., *id.,* §§ 500–505.) But the State Farm policyholders do not contend that the regulations apply to State Farm.

Of interest, the Model Business Corporation Act contains a provision stating: "This Act does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state." (Model Business Corporation Act (1984) § 1505(c), reprinted in 1 Fletcher, Cyclopedia of the Law of Private Corporations (2003 supp.) § 2.25, pp. 1, 138.) As indicated by its drafters, the act "preserves the judicially developed doctrine that internal corporate affairs are governed by the state of incorporation even when the corporate business and assets are located

primarily in other states." (Model Business Corporation Act (1984) § 15.05(c), off. com., quoted in *Harrison v. NetCentric Corp.* (2001) 433 Mass. 465, 471–472 [744 N.E.2d 622, 629].) The act's internal affairs provision has been adopted by at least 28 states.[4]

In sum, the policyholders seek to hold State Farm liable for not declaring dividends. As recognized by a consistent line of authority, the internal affairs doctrine mandates that such liability be determined under the law of State Farm's place of incorporation, Illinois.

## C. Illinois Law

Having decided that Illinois law governs this case, we first discuss current Illinois law with respect to civil actions seeking to impose liability on a corporation for not declaring dividends. We then focus on the application of the covenant of good faith and fair dealing under Illinois law. Finally, we address State Farm's contention that the internal affairs doctrine requires that the present action be dismissed and refiled in Illinois.

### 1. *Liability for Not Declaring Dividends*

More than 75 years ago, the Illinois Supreme Court addressed the issue before us, stating: "There is a difference of opinion among the stockholders as to the reason or desirability of maintaining so large a cash surplus, [one side] believing that . . . it is wise business management to keep a large surplus in reserve . . . , and the [other side] believing that good business judgment and wise economy require the distribution of a large part of the surplus . . . . These are questions of business judgment to be determined by the directors of the

---

[4] Alabama (Ala. Code § 10-2B-15.05(c)); Arizona (Ariz. Rev. Stat. Ann. §§ 10-1505(C), 10-11505(C)); Arkansas (Ark. Code Ann. §§ 4-27-1505(c), 4-33-1505(c)); Colorado (Colo. Rev. Stat. §§ 7-56-805(3), 7-115-105(3), 7-135-105(3)); Connecticut (Conn. Gen. Stat. §§ 33-924(c), 33-1214(c)); Florida (Fla. Stat. Ann. §§ 607.1505(3), 608.505(3), 617.1505(3)); Georgia (Ga. Code Ann. §§ 14-2-1505(c), 14-3-1505(c)); Hawaii (Haw. Rev. Stat. §§ 414-435(c), 414D-275(c)); Idaho (Idaho Code §§ 30-1-1505(3), 30-3-120(3)); Indiana (Ind. Code Ann. §§ 23-1-49-5(c), 23-17-26-5(c)); Iowa (Iowa Code § 490.1505(3)); Kentucky (Ky. Rev. Stat. Ann. §§ 271B.15-050(3), 275.405(3)); Maine (Me. Rev. Stat. Ann. tit. 13-C, § 1505(3)); Mississippi (Miss. Code Ann. §§ 79-4-15.05(c), 79-11-371(3)); Missouri (Mo. Rev. Stat. §§ 351.582(3), 355.771(3)); Montana (Mont. Code Ann. §§ 35-1-1030(3), 35-2-824(3), 35-8-1008(3)); Nebraska (Neb. Rev. Stat. § 21-19,150(c)); New Hampshire (N.H. Rev. Stat. Ann. § 293-A:15.05(c)); Oregon (Or. Rev. Stat. §§ 60.714(3), 65.714(3)); South Carolina (S.C. Code Ann. §§ 33-15-105(c), 33-31-1505(c)); Tennessee (Tenn. Code Ann. §§ 48-25-105(c), 48-65-105(c)); Utah (Utah Code Ann. §§ 16-6a-1505(3), 16-10a-1505(3), 48-2c-1601(1)); Vermont (Vt. Stat. Ann. tit. 11A, § 15.05(c) & tit. 11B, § 15.05(c)); Virginia (Va. Code Ann. §§ 13.1-761(C), 13.1-923(C)); Washington (Wash. Rev. Code Ann. § 23B.15.050(3)); West Virginia (W.Va. Code §§ 31D-15-1505(c), 31E-14-1405(c)); Wisconsin (Wis. Stat. §§ 180.1505(3), 181.1505(3)); Wyoming (Wyo. Stat. §§ 17-16-1505(c), 17-19-1505(c)).

corporation in their discretion, which will not be controlled by the court so long as it is exercised in good faith and in honesty of purpose. . . . Each party has sought to avail itself of such advantages as the law gave it, but the record does not show *fraud, oppression, or dishonest conduct.*" (*Hall v. Woods* (1927) 325 Ill. 114, 140–141 [156 N.E. 258, 268], italics added.)

Less than 10 years later, the Appellate Court of Illinois explained that "[c]ourts will not compel [the declaration of a dividend] on the part of a corporation unless the withholding of the dividend is *oppressive and entirely without merit.* Courts of chancery will not concern themselves with the operations of a private corporation except on the ground of *fraud* or an impairment of the capital structure which would result in complete or very substantial loss. . . .

"[W]e can see no reason for compelling a dividend, particularly in view of the present [economic downturn] and the present attitude of all corporations to conserve as far as possible its working capital for future contingencies. The question of a dividend at this time is one which rests wholly in the business judgment of the board of directors and a court of chancery should not substitute its judgment for that of [the directors] actively engaged in business in the community." (*Hofeller v. General Candy Corp.* (1934) 275 Ill.App. 89, 96 [1934 Ill.App.LEXIS 379, *12–*13], italics added, citation omitted.)

"The decision concerning the declaration of a dividend where a legal dividend fund is available rests within the sole discretion of the board of directors. Courts are reluctant to interfere with the exercise of the directors' business judgment unless the withholding is *fraudulent, oppressive or totally without merit.*" (*Romanik v. Lurie Home Supply Center, Inc.* (1982) 105 Ill.App.3d 1118, 1134 [435 N.E.2d 712, 723, 61 Ill.Dec. 871], italics added.)

As stated more recently: "The business judgment rule is a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interests of the corporation. . . . Like most rebuttable presumptions, it arises by operation of law. . . . However, the plaintiff may rebut the presumption by presenting evidence that the director[s] acted *fraudulently, illegally, or without becoming sufficiently informed to make an independent business decision.* . . . [¶] . . . [¶] . . . The burden is on the party challenging the decision to present facts rebutting the presumption." (*Ferris Elevator Co., Inc. v. Neffco, Inc.* (1996) 285 Ill.App.3d 350, 354–355 [674 N.E.2d 449, 452–453, 220 Ill.Dec. 906].)

Illinois law is in accord with a leading treatise on corporate decision-making: "The business judgment rule protects a board's decision regarding

payment of a dividend or the making of a distribution. A court will not compel a distribution unless withholding the distribution is explicable only on the theory of an *oppressive or fraudulent abuse of discretion*." (3A Fletcher, Cyclopedia of the Law of Private Corporations (2002 rev.) § 1041.20, p. 58, italics added, fn. omitted.)

"The fact that a corporation has earned profits out of which directors might lawfully declare a dividend . . . is insufficient alone to justify judicial intervention compelling a declaration and payment. Because the decision of the board of directors to declare and pay dividends is protected by the business judgment rule, the burden of proof on the shareholder seeking to compel the declaration and payment . . . is particularly stringent." (11 Fletcher, Cyclopedia of the Law of Private Corporations (2002 rev.) § 5325, pp. 584–586, fns. omitted.)

Thus, absent one of the exceptions to the business judgment rule—fraud, oppression, dishonesty, total lack of merit, illegality, or a failure of the board of directors to become sufficiently informed to make an independent decision—a corporation is not liable for a lack of dividends.

### 2.  *Covenant of Good Faith and Fair Dealing*

The parties disagree as to whether California and Illinois courts apply the covenant of good faith and fair dealing in the same way. For guidance, we set forth the principles under current Illinois law.

The Illinois Supreme Court has recognized a cause of action for breach of the covenant of good faith and fair dealing, sounding in tort, where an insurer breaches its duty to settle a third party claim brought against the insured. (See *Cramer v. Insurance Exchange Agency* (1996) 174 Ill.2d 513 [675 N.E.2d 897, 221 Ill.Dec. 473] (*Cramer*).) The covenant does not provide a tort remedy in first party cases. (*Id.* at pp. 525–527 [675 N.E.2d at pp. 903–904; *Voyles v. Sandia Mortg. Corp.* (2001) 196 Ill.2d 288, 296 [751 N.E.2d 1126, 1131, 256 Ill.Dec. 289].)

In *Cramer, supra*, 174 Ill.2d 513 [675 N.E.2d 897], the court "refused to recognize an independent action *in tort* for breach of an implied covenant of good faith and fair dealing, stating that the claim would be proper *only* in the *narrow context* of cases involving an insurer's obligation to settle with a third party who has sued the policyholder." (*Voyles v. Sandia Mortg. Corp. supra*, 196 Ill.2d at p. 296 [751 N.E.2d at p. 1131], italics added.)

Here, the policyholders rely on *National Sur. Corp. v. Fast Motor Serv.* (1991) 213 Ill.App.3d 500 [572 N.E.2d 1083, 157 Ill.Dec. 619] (*National Sur.*

*Corp*).) In that case, the insured sued its insurer under a workers' compensation policy, alleging that the insurer had improperly adjusted claims, resulting in increased premiums. The Appellate Court of Illinois held that "an insured should be able to state a viable cause of action for breach of an insurer's duty of good faith based on the insurer's failure to act reasonably when adjusting claims under a policy of insurance which contains a retrospective premium feature . . . . When an insurance policy contains a retrospective premium feature, an insurer's failure to act reasonably when adjusting claims automatically subjects the insured to greater financial obligations in the form of increased premium rates. [¶] . . . [¶] . . . [A] cause of action is stated when an insured sues his insurer for a breach of duty for settling claims in an unreasonable manner when the policy of insurance contains a retrospective premium feature." (*National Sur. Corp., supra,* 213 Ill.App.3d at pp. 505–506 [572 N.E.2d at p. 1087].)

In *National Sur. Corp., supra,* 213 Ill.App.3d 500 [675 N.E.2d 897], the court also concluded that a breach of the covenant permitted a recovery in tort. (*Id.* at p. 506 [572 N.E.2d at p. 1087].) Given the facts in *National Sur. Corp,* that conclusion is at odds with the more recent decisions of the Illinois Supreme Court. (See *Cramer, supra,* 174 Ill.2d at pp. 525–527 [675 N.E.2d at pp. 903–904]; *Voyles v. Sandia Mortg. Corp., supra,* 196 Ill.2d at p. 296 [751 N.E.2d at p. 1131].)

"The obligation of good faith and fair dealing primarily is used to determine the intent of the parties where a contract is susceptible to two conflicting constructions." (*Coleman v. Madison Two Associates* (1999) 307 Ill.App.3d 570, 578 [718 N.E.2d 668, 675, 241 Ill.Dec. 97]; accord, *St. Mary's Hosp. v. HPO* (1999) 309 Ill.App.3d 464, 469 [721 N.E.2d 1213, 1217, 242 Ill.Dec. 682].) " '[W]here an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted.' " (*Cramer, supra,* 174 Ill.2d at pp. 523–524 [675 N.E.2d at p. 903].)

As a general matter, " '[the covenant] ensures that parties do not try to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or to do anything that will destroy the other party's right to receive the benefit of the contract. . . . This contractual covenant is not generally recognized as an independent source of duties giving rise to a cause of action in tort. . . .' . . . [¶] . . . [¶]

"[The] description of the covenant of good faith and fair dealing as a rule of construction, rather than an independent source of tort liability, [is] not limited to the area of insurance law, and is as apt [in non-insurance cases] as it is in other circumstances." (*Voyles v. Sandia Mortg. Corp., supra,* 196 Ill.2d

at pp. 296–297 [751 N.E.2d at p. 1131].) "While every contract in Illinois contains an implied covenant of good faith, it is not an independent source of duties for the parties to the contract." (*Guardino v. Chrysler Corp.* (1998) 294 Ill.App.3d 1071, 1080 [691 N.E.2d 787, 793, 229 Ill.Dec. 314.) "Illinois law does not recognize independent claims based on breaches of any implied duties of good faith. . . . [¶] . . . [¶] . . . The proper place for [a plaintiff's] implied covenant argument [is] within a breach of contract claim, not standing alone as its own claim." (*Echo, Inc. v. Whitson Co., Inc.* (7th Cir. 1997) 121 F.3d 1099, 1105–1106 (applying Illinois law).)

"These implied covenants are generally implicated where one party to a contract is given broad discretion in performance. . . . 'The doctrine of good faith then requires the party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.' . . .

"Notwithstanding these implied covenants, however, '[p]arties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith.' . . . 'Express covenants abrogate the operation of implied covenants so courts will not permit implied agreements to overrule or modify the express contract of the parties.' " (*Perez v. Citicorp Mortg., Inc.* (1998) 301 Ill.App.3d 413, 424 [703 N.E.2d 518, 525, 234 Ill.Dec. 657], citations omitted; accord, *St. Mary's Hosp. v. HPO, supra,* 309 Ill.App.3d at p. 469 [721 N.E.2d at p. 1217]; *Diamond v. United Food & Commercial Workers* (2002) 329 Ill.App.3d 519, 526–527 [768 N.E.2d 865, 871, 263 Ill.Dec. 784].)

In the present case, the trial court concluded that, under California and Illinois law, the covenant confers the same rights and obligations. We conclude otherwise. Under California law, a breach of the covenant may be pleaded and adjudicated as a distinct cause of action; the covenant is not primarily used to construe a contract that is susceptible of two conflicting interpretations; and tort remedies are not restricted to third party claims. (See generally *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 879–881, 905 [93 Cal.Rptr.2d 364]; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 682–700 [254 Cal.Rptr. 211, 765 P.2d 373].) That is not the law in Illinois.[5]

We emphasize that, as just discussed, the board of directors' decision with regard to dividends is protected by the business judgment rule unless one of the rule's exceptions applies. (See pt. II.C.1., *ante.*) If the board's

---

[5] In their opposition to the petition for writ of mandate, the policyholders state that they are not seeking tort relief.

decision is proper under the business judgment rule, then the covenant of good faith and fair dealing—an aid in determining contract rights—cannot be used as an end-run to impose liability here. (See *Kelley v. American Sugar Refining Co., supra*, 139 F.2d at p. 79; *LaSalle Nat. Bank v. Perelman, supra*, 82 F.Supp.2d at p. 289; *Relief Assn. of U. Wks., etc. v. Equitable L. Assur. Soc., supra*, 140 OhioSt. at pp. 72–73 [42 N.E.2d at pp. 655–656]; *Ellis v. Mutual Life Ins. Co. of New York, supra*, 187 So. at pp. 436, 449–450.)

### 3. *Dismissal of the Action*

State Farm contends that the internal affairs doctrine requires that this action be dismissed and that the policyholders file suit in Illinois. We disagree.

"At one time, many jurisdictions followed a doctrine to the effect that the courts of one State would not 'interfere with or control by injunction or otherwise the management of the internal affairs of a corporation organized under the laws of another State but [would] leave controversies as to such matters to the courts of the State of the domicile' . . . . On this basis, suits brought by domestic shareholders against foreign corporations were often dismissed when the shareholder was affected solely in his capacity as a member of the corporation . . . .

"Older cases tended to view the doctrine as jurisdictional, justifying the refusal to entertain such litigation on the premises that it was inadvisable to interpret the law of another State, that the possibility of conflicting decisions should be avoided, and that the court's judgment might not be enforceable elsewhere . . . . The doctrine was nonetheless subject to numerous exceptions, and other decisions tended to view the question as one of discretion, based on considerations of convenience and public policy, not a lack of power . . . .

"The doctrine was questioned by the Supreme Court of the United States in *Williams v. Green Bay & W.R. Co.* (1946) 326 U.S. 549 [90 L.Ed. 311, 66 S.Ct. 284] and abrogated entirely in the Federal courts a year later in *Koster v. (American) Lumbermens Mutual Co.* [(1947)] 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067, [(*Koster*)], the court holding, in effect, that the 'internal affairs' rule is not entitled to separate status and should be treated as one facet under general principles of *forum non conveniens*. . . .

" 'The vague principle that courts will not interfere with the internal affairs of a corporation whose foreignness is at best a metaphysical concept, must fall before the practical necessities of the modern business world' . . . . [A] suit which concerns the internal affairs of a foreign corporation should be entertained unless [it would be dismissed] under *forum non conveniens*

principles . . . ." (*Broida v. Bancroft* (1984) 103 A.D.2d 88, 90–91 [478 N.Y.S.2d 333, 335], citations omitted.)

The Illinois Supreme Court has reached the same conclusion: "In early cases the acceptance or denial of jurisdiction of derivative actions against foreign corporations turned on what the courts determined was or was not interference with the internal affairs of the corporation . . . . We feel that the acceptance or denial of jurisdiction of such actions should be decided under the doctrine of *forum non conveniens* and that interference with the internal affairs of a foreign corporation is only one factor in determining whether an Illinois court would serve the convenience of the parties and the ends of justice." (*Lonergan v. Crucible Steel Company of America* (1967) 37 Ill.2d 599, 605 [229 N.E.2d 536, 539].)

California law is no different. In *American Cemwood Corp. v. American Home Assurance Co.* (2001) 87 Cal.App.4th 431, 439 [104 Cal.Rptr.2d 670], the court, discussing forum non conveniens, cited *Koster, supra,* 330 U.S. at page 527, with approval. In *Koster,* the Supreme Court stated: "There is no rule of law . . . which requires dismissal of a suitor from the forum on a mere showing that the trial will involve issues which relate to the internal affairs of a foreign corporation. That is one, but only one, factor which may show convenience of parties or witnesses, the appropriateness of trial in a forum familiar with the law of the corporation's domicile, and the enforceability of the remedy if one be granted. But the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." (*Koster, supra,* 330 U.S. at p. 527.)

As one commentator has explained: "Historically, corporations were viewed as creations of the individual states. Corporate charters were granted at the pleasure of state legislatures. As corporations were created only through state charters, an internal affairs rule quickly developed, dictating that only the chartering state could regulate the entity it created. Early cases treated the internal affairs rule as a forum derogation concept, a theory that courts really did not have jurisdiction over foreign corporations. By the early 1950s, these jurisdictional elements became merely ones of forum non conveniens and the internal affairs rule became one of deferring to the substantive law of the state of incorporation." (Johnson, *Risky Business: Choice-of-Law and the Unincorporated Entity, supra,* 1 J. Small & Emerging Bus. L. at pp. 268–269, fns. omitted.)

Other commentators are in agreement. (See, e.g., Beveridge, *The Internal Affairs Doctrine: The Proper Law of a Corporation* (1989) 44 Bus. Law. 693, 696–698; Macey & Miller, *Toward an Interest-Group Theory of Delaware Corporate Law* (1987) 65 Tex. L.Rev. 469, 496, fn. 97; Comment, *Considerations of Choice of Law in the Doctrine of Forum Non Conveniens* (1986) 74

Cal. L.Rev. 565, 567, fn. 11, 572, fn. 40; Loss, *The SEC Proxy Rules in the Courts* (1960) 73 Harv. L.Rev. 1041, 1066–1067.)

■ Ignoring the foregoing law, State Farm argues that any lawsuit challenging its dividend decisions must be filed in Illinois so as to avoid inconsistent jury verdicts that would result if suits were brought in other states. Not so. Under the internal affairs doctrine, *Illinois law* would govern the determination of liability regardless of where suit might be brought. Thus, State Farm faces the same risk of inconsistent verdicts whether suits are filed in different states or in Illinois.

In closing, we note that, at oral argument, one of the parties intimated that State Farm's motion to dismiss was based on forum non conveniens, not the doctrine of internal affairs. Our review of the record indicates that the motion was grounded on internal affairs alone. In its moving papers below, State Farm pointed out the differences between the internal affairs doctrine and forum non conveniens and argued for dismissal based solely on internal affairs. In their opposition to the petition for writ of mandate, the policyholders claim that State Farm did not raise forum non conveniens below and "continues to ignore . . . forum non conveniens analysis [in its petition here]." And the trial court's statement of decision did not mention the subject. Accordingly, nothing we have said precludes such a motion.

## III

## DISPOSITION

Let a peremptory writ of mandate issue, commanding respondent court to vacate its decision dated May 21, 2003, and issue a new and different decision consistent with this opinion. Petitioner and real parties in interest are to bear their own costs in connection with this proceeding.

Spencer, P. J., and Ortega, J., concurred.